**Nadia NATHAN, Plaintiff,**

v.

**The OHIO STATE UNIVERSITY, et al., Defendants.**

**Case No. 2:10–CV–872.**

United States District Court,
S.D. Ohio,
Eastern Division.

Oct. 29, 2013.

Randolph Harry Freking, Elizabeth S. Loring, Freking & Betz, Cincinnati, OH, for Plaintiff.

Christina Corl, Daniel J. Hurley, Larry Holliday James, Crabbe Brown & James, Columbus, OH, for Defendants.

### OPINION AND ORDER

GEORGE C. SMITH, District Judge.

This matter is before the Court on Defendants The Ohio State University and The Ohio State University Medical Center's ("OSU") [1] Motion for Summary Judgment (Doc. 105). The motion is fully briefed and ripe for disposition. For the reasons that follow, the Court **GRANTS** OSU's motion.

## I. Background

Plaintiff Nadia Nathan is a female cardiac anesthesiologist. Plaintiff was born in Egypt in 1958. From 1998 until 2005, Plaintiff was employed at Brigham and Women's Hospital ("Brigham Hospital") in Boston as an instructor of anesthesia and staff anesthesiologist. In October 2004, Plaintiff filed a charge of discrimination with the Massachusetts Commission Against Discrimination against Brigham Hospital, alleging *inter alia* gender dis-

---

1. The medical center is part of the university, and thus is not a separate legal entity. There-fore, the Court will refer to the named Defendants in the singular and simply as "OSU."

crimination, including sexual harassment. Plaintiff's claims of discrimination and retaliation were not resolved prior to Plaintiff starting to work at OSU in 2005.

Plaintiff began her employment with OSU in February 2005 as an Associate Professor and practicing physician. When Plaintiff interviewed with OSU, she fully disclosed the claims she had made against Brigham Hospital. Plaintiff and OSU entered into an employment agreement, which provided that the agreement could be terminated at any time with or without cause. In view of Plaintiff's training and experience, she was assigned to the Department of Anesthesiology at OSU and became a member of the Cardiac Anesthesia Group within said department.

Dr. Michael Howie was the chair of the Department of Anesthesiology when OSU hired Plaintiff. Soon thereafter, Dr. Howie resigned and was replaced by Dr. Daniel Sedmak as interim chair. While Dr. Sedmak had no direct experience managing anesthesiologists, he had extensive experience managing medical faculty at OSU. Dr. Sedmak was not involved in the hiring of Plaintiff, and he has testified that while he was interim chair he had no knowledge of Plaintiff's legal matter with her former employer in Boston. During his time as interim chair, Dr. Sedmak evaluated Plaintiff's performance and had problems with it. Dr. Sedmak testified that Plaintiff had difficulty focusing and meeting expectations, and had trouble being productive as it relates to her research responsibilities. According to Dr. Sedmak, because of these issues, "if [he] continued as interim chair, she was on a pathway to being terminated." (Sedmak Dep. at 42).

In January 2007, OSU hired Dr. David Zvara as chair of the Anesthesiology Department. After Dr. Zvara was hired as chair, Dr. Sedmak met with him as part of the leadership transition to discuss the then current issues of the department. At that meeting, Dr. Sedmak raised the subject of Plaintiff. Dr. Sedmak advised Dr. Zvara that he should consider not renewing her clinical contract with OSU. Plaintiff's contract was renewed, however, despite the advice given to Dr. Zvara.

Around the time Dr. Zvara became department chair, he became aware that Plaintiff had alleged that she was subjected to sexual harassment during her employment at Brigham Hospital, and that Dr. Stan Shernan was somehow involved. Dr. Zvara was a professional acquaintance of Dr. Shernan, and the two met sometime between 1998 and 2000. The two worked with each other at lectures and workshops and both served on the Board of Directors of the Society of Cardiac Anesthesiologists. Dr. Zvara acknowledges that the two could be considered friends but that he does not socialize with Dr. Shernan outside of the professional conferences. At a conference in the spring of 2007, Dr. Zvara spoke with Dr. Shernan and generally inquired into the status of Plaintiff's allegations involving Brigham Hospital and Dr. Shernan. Dr. Shernan responded that he could not discuss the matter.

In April 2007, Plaintiff filed suit in the United States District of Massachusetts against Brigham Hospital alleging gender, race, and national origin discrimination, and retaliation for complaining about such treatment. In May 2008, Brigham Hospital moved for summary judgment. Before Brigham Hospital's motion was ruled upon, the parties settled. A settlement order of dismissal was filed on September 22, 2008. *See Nathan v. Brigham & Women's Hospital,* Case No. 07–10667–WGY (U.S.Dist.Mass. Sept. 22, 2008). Upon learning that the lawsuit in Massachusetts had settled, Dr. Zvara asked Dr. Shernan if he was relieved the matter was

resolved, to which Dr. Shernan responded affirmatively.

In November 2008, Dr. Zvara left OSU to work at the University of North Carolina. Dr. Ronald Harter, who had previously been the Vice Chair for Education for the Department of Anesthesiology at OSU, was appointed interim chair of the Department of Anesthesiology. Dr. Harter had learned about Plaintiff's claims against the Brigham Hospital sometime after he returned to the OSU faculty in 2007. Shortly after Dr. Harter became interim chair, Plaintiff was up for reappointment. Dr. Harter was aware that Plaintiff's performance had been raised as a potential problem, and Dr. Zvara advised him of the issues he had regarding Plaintiff, relating to such matters as complaints about her professionalism and her teaching evaluations. However, Dr. Harter indicated to Dr. Robert Bornstein, the Associate Vice President of Health Services and Academic Affairs, that he wanted Plaintiff to have a "clean slate," and he did not want to make any decision as it relates to her based on a predecessor's evaluation of her. (Bornstein Dep. at 18). Dr. Harter decided to recommend Plaintiff's reappointment to her faculty position, and thus for her to remain on the medical staff, in February 2009. Two months later, Dr. Harter decided that Plaintiff's employment at OSU should be terminated.

Dr. Harter testified that Plaintiff engaged in various conduct that was disruptive to the operations of the department, and that this conduct led to his decision to terminate her employment. In particular, Dr. Harter testified that Plaintiff manipulated clinical assignments to her benefit and the detriment of others, arrived late for clinical duty in the morning, and had disruptive interactions with surgeons. Dr. Harter testified that the frequency of Plaintiff not completing post-operative orders was also concerning and detrimental to patient care. Dr. Harter testified that when he received word that Plaintiff had not completed post-operative orders, he would so advise her, and that, upon receiving word that she needed to complete certain postoperative orders, Plaintiff would view this as a personal attack and proceed to survey others in the department to determine if they had made similar mistakes or oversights. Dr. Harter viewed this surveying as being disruptive to the department.

Dr. Harter testified that he ultimately arrived at his decision to terminate Plaintiff's employment following two particular circumstances in April 2009. Sometime during that month, Dr. Harter received an automatic message from the resident evaluation system indicating Plaintiff's unavailability and untimeliness in responding to the operating rooms. As a result of receiving the message, Dr. Harter also reviewed previous evaluations and noted that multiple complaints had been made about Plaintiff not being available to supervise the residents in the operating rooms. Around the same time, a scheduling issue arose in the department. When the work schedule for April 2009 was being drafted, Plaintiff requested to attend a conference during that month, which was being held concurrently with a Society of Cardiovascular Anesthesiologists meeting, where two of the doctors in the department were presenting. Staffing limitations required Plaintiff to be on the mid-April 2009 schedule. After the schedule was published, a family death required one of the physicians on the schedule to travel to China, leaving the department staffing level further strained. On April 20, 2009, Plaintiff was scheduled to work. However, she called in sick before her shift was scheduled to begin that day, indicating that she had food poisoning. Because Plaintiff did not work on April 20, 2009, one of the other physi-

cians in the department had to work extraordinary hours to fill the staffing need. Plaintiff reported to work on April 21, 2009. Dr. Harter viewed Plaintiff's statement that she had food poisoning to be suspect, considering she had vigorously lobbied to have the day off when the schedule for April was created.

In July 2009, Dr. Harter informed Plaintiff that her clinical employment would be terminated, effective October 5, 2009. The termination was "without cause" and prevented Plaintiff from practicing medicine at OSU, and limited her to work as a temporary Associate Professor at OSU. When Plaintiff obtained another clinical position in 2010, OSU terminated her academic employment. Dr. Harter testified that the decision to terminate Plaintiff's employment was his own, and was based on his own findings, and was not based on allegations or contentions made by any previous chair of the department. Dr. Harter further testified that he made the decision to terminate Plaintiff "without cause" pursuant to her employment agreement because a termination "for cause" could have impeded Plaintiff's ability to find other employment.

In September 2010, Plaintiff initiated this employment action against OSU pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Age Discrimination and Employment Act, 29 U.S.C. § 626 *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615 *et seq.*, asserting discrimination and retaliation claims. Specifically, Plaintiff's Amended Complaint sets forth the following claims: gender and national origin discrimination under Title VII (Count I); retaliation under Title VII (Count II); First Amendment retaliation (Count III); age discrimination (Count IV); and FMLA interference and retaliation (Count V).[2]

In July 2012, OSU filed its Motion for Summary Judgment. Briefing on the motion was held in abeyance for approximately one year due to prolonged discovery disputes. Plaintiff filed her response in opposition to OSU's motion in July 2013, and OSU filed its reply in August 2013.

On August 22, 2013, Plaintiff filed a one-page Motion for Leave to File a Surreply (Doc. 178), asserting that OSU had advanced new arguments in support of its motion for summary judgment in its reply brief. OSU filed a response in opposition to Plaintiff's motion. Plaintiff filed a reply in support, attaching her proposed surreply. OSU moved to strike Plaintiff's reply in support and all exhibits, including the proposed surreply, attached thereto. The Court finds that Plaintiff's Motion for Leave to File a Surreply is problematic because she only fully develops her arguments in support of the motion in her reply brief. And she attached the proposed surreply to the reply brief in support of the motion, not to the original brief. Nonetheless, the Court **GRANTS** Plaintiff's request to file her surreply (Doc. 178), and **DENIES** OSU's Motion to Strike (Doc. 181), because even if the Court considers the additional arguments made by Plaintiff, OSU is still entitled to summary judgment, for the reasons set forth below.[3]

**2.** Plaintiff has since abandoned her claims of national origin discrimination, First Amendment retaliation, age discrimination, and FMLA interference. Accordingly, these claims will be dismissed with prejudice.

**3.** Plaintiff requests oral argument on OSU's Motion for Summary Judgment pursuant to S.D. Ohio Civ. R. 7.1(b)(2), which states that oral argument is proper when it is essential to the fair resolution of the case because of its public importance or the complexity of the issues. The Court finds that oral argument is not essential to the fair resolution of this case.

## II. Standard of Review

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir.2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–53, 106 S.Ct. 2505. Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to

be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir.1978). The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir.2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989) (quoting *Liberty Lobby*, 477 U.S. at 257, 106 S.Ct. 2505). The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. 2505; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479–80. That is, the nonmoving party

Thus, Plaintiff's request for oral argument is **DENIED.**

has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris,* 260 F.3d 654, 665 (6th Cir.2001).

## III. Discussion

In view of Plaintiff's abandonment of certain claims, the following claims remain pending in this action: gender discrimination under Title VII, retaliation under Title VII, and retaliation under the FMLA. The Court will analyze together Plaintiff's two remaining Title VII claims, and then will resolve her retaliation claim under the FMLA.

### A. Employment Discrimination and Retaliation

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a)(1). Title VII also prohibits an employer from retaliating against an employee who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Here, Plaintiff alleges that OSU discriminated against her because of her gender, and that OSU retaliated against her for engaging in conduct protected by Title VII. OSU argues that these claims fail as a matter of law. The Court agrees with OSU.

A discrimination or retaliation claim under Title VII may be based upon direct or circumstantial evidence. *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400–01 (6th Cir. 2009); *Johnson v. Kroger Co.,* 319 F.3d 858, 864–65 (6th Cir.2003). Direct evidence is "evidence that proves the existence of a fact without requiring any in-

ferences." *Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 548 (6th Cir.2004). Here, Plaintiff does not allege the existence of direct evidence of gender discrimination or retaliation. Absent direct evidence, such claims must be evaluated under the three-part *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Chen, supra.*

Under the *McDonnell Douglas* test, if the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to come forward with a legitimate, non-discriminatory and non-retaliatory reason for the adverse action against the plaintiff. *Hicks,* 509 U.S. at 506–507, 113 S.Ct. 2742; *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant comes forward with a legitimate, non-discriminatory and non-retaliatory reason for its actions, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination or retaliation. *Hicks,* 509 U.S. at 512 n. 4, 113 S.Ct. 2742; *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. "The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

To establish a *prima facie* claim of gender discrimination, a plaintiff must show that she: (1) is a member of the protected class; (2) suffered an adverse employment action; (3) was qualified for the position; and (4) was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *Grace v. USCAR,* 521 F.3d

655, 677 (6th Cir.2008). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the defendant knew of this exercise of his protected rights; (3) the defendant consequently took an action that was "materially adverse" to the plaintiff; and (4) there is a causal connection between the protected activity and the materially adverse action. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir.2003); *see also Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (modifying the third element to require a "materially adverse action" rather than an "adverse employment action").

To show pretext, a plaintiff must show that the employer's proffered reasons: (1) lack a basis in fact; (2) did not actually motivate the employer's adverse action; or (3) are insufficient to motivate the employer's adverse action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). A pretextual explanation in this context essentially means a fabricated explanation to conceal an illegal motive. *See Chen*, 580 F.3d at 400. Further, the Sixth Circuit has cautioned that courts should "avoid formalism" in the application of the *Manzer* test, "lest one lose the forest for the trees." *Chen*, 580 F.3d at 400, n. 4. Pretext, the court observed, "is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Id.*

If an employer demonstrates an honest belief in its proffered non-discriminatory reason for discharging an employee, the employee cannot establish pretext just because that reason is ultimately shown to be incorrect. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir.2001). Under the Sixth Circuit's "modified honest-belief doctrine," an employer can avoid a finding of pretext where it can "establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Russell v. Univ. of Toledo*, 537 F.3d 596, 605 (6th Cir.2008) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir.2006)). Thus, a plaintiff cannot show pretext by merely disputing the allegations or questioning the validity of the defendant's investigation. *Braithwaite v. Timken Company*, 258 F.3d 488, 493 (6th Cir.2001). Instead, a plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id.* at 494 (citing *Smith v. Chrysler*, 155 F.3d 799, 806–807 (6th Cir.1998)). Ultimately, to raise a question of fact as to pretext, the plaintiff must produce sufficient evidence from which the jury could reasonably reject the employer's explanation for the challenged adverse employment action. *See id.; Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir.2001). Therefore, if a jury could not reasonably doubt the employer's explanation, based on the evidence presented, summary judgment in favor of the employer is proper. *Chen*, 580 F.3d at 400, n. 4.

For the purpose of the Court's resolution of Plaintiff's claims of gender discrimination and retaliation in violation of Title VII, it will assume that Plaintiff can establish a *prima facie* case of gender discrimination and retaliation in violation of Title VII. The Court will focus its analysis on OSU's reasoning for adverse action taken against Plaintiff, and Plaintiff's attempt to demonstrate that the reasons provided by OSU are pretextual. The primary issue

presented is whether there is a genuine issue of fact as to whether the legitimate, non-discriminatory and nonretaliatory reasons provided by OSU for adverse action taken against Plaintiff constitute pretext for illegal discrimination and retaliation.

OSU argues that any adverse employment action taken against Plaintiff, including her termination from employment, was a result of Plaintiff's substandard performance, not any discriminatory or retaliatory intent. OSU asserts that the following legitimate, non-discriminatory and non-retaliatory reasons provided the basis for every action of which Plaintiff complains. OSU contends that Plaintiff manipulated the departmental schedule and disrupted the department by calling in sick in violation of department policy, received complaints from residents regarding teaching and availability, did not timely complete charts and post-operative orders, arrived late for clinical duty, had problematic interactions with surgeons, and generally was unavailable.

Plaintiff asserts that the reasons set forth by OSU for the adverse employment actions taken against her, culminating in her termination, are pretextual. In support of her pretextual argument, Plaintiff analyzes the evidence relating to the alleged issues each of her supervisors, Drs. Sedmak, Zvara, and Harter, had with her performance. Plaintiff generally alleges that her supervisors' concerns about her performance were, or have been, manufactured to conceal unlawful retaliation and discrimination. Thus, Plaintiff attempts to cast doubt on each of her supervisors explanations for any unfavorable action taken against her. The arguments relating to each supervisor will be addressed in turn. These arguments center on whether the reasons are based in fact. Plaintiff also argues that the proffered reasons for her termination were insufficient to motivate the employment action. This argument will be addressed separately.

### 1. Dr. Sedmak

Plaintiff asserts that OSU heavily relies on Dr. Sedmak's alleged dissatisfaction with her performance in support of the ultimate termination decision. Plaintiff asserts that she has demonstrated a genuine issue of fact regarding each issue Dr. Sedmak had relating to her performance. That is, Plaintiff challenges the claims of deficiencies alleged by Dr. Sedmak. Plaintiff contends that OSU, in contradictory fashion, asserts that Dr. Sedmak's alleged dissatisfaction with Plaintiff's performance put her "on a path to termination," but that Dr. Harter gave Plaintiff a "clean slate" when he became chair of the department. Plaintiff argues that OSU cannot have it both ways.

Plaintiff's arguments regarding Dr. Sedmak miss the mark. OSU does not rely on Dr. Sedmak's alleged dissatisfaction with Plaintiff's performance as an explanation for her termination. Instead, OSU provides evidence of Dr. Sedmak's dissatisfaction as a background to Plaintiff's employment at OSU and to refute Plaintiff's suggestion that there were no issues relating to her performance prior to the arrival of Dr. Zvara. Moreover, Plaintiff does not allege that Dr. Sedmak harbored any discriminatory or retaliatory animus toward her, or that he took any adverse action against her. Although Dr. Sedmak did advise Dr. Zvara to consider not reappointing Plaintiff, she was reappointed despite this advice. Nor does Plaintiff allege that Dr. Sedmak purposely took action to unfairly taint others' view of her performance at OSU. For these reasons, Plaintiff's attempt to discredit the assertions of Dr. Sedmak are unavailing and do not create a genuine issue of material fact.

## 2. Dr. Zvara

According to Plaintiff, Dr. Zvara's concerns about her performance are pretext for retaliation and discrimination. Plaintiff argues that OSU cannot fairly cite her alleged performance issues identified by Dr. Zvara and then, at the same time, contend that Dr. Zvara's concerns are irrelevant to the pretext analysis. Plaintiff argues that Dr. Zvara retaliated against her for engaging in protected conduct, and was a force behind her termination. Plaintiff asserts that she has demonstrated that Dr. Zvara's discipline of her was unfounded, that he recruited others to manufacture support for discipline, and that he denied her opportunities for research and advancement that were offered to males and others who had not complained about him. Plaintiff argues that a jury could reasonably view Dr. Zvara's correspondences addressing alleged performance issues as pretext for retaliation and discrimination.

OSU contends that Plaintiff conflates two distinct issues concerning Dr. Zvara into one. The two issues addressed by Plaintiff's arguments are whether Dr. Zvara retaliated against her for engaging in protected activity and whether she was terminated by Dr. Harter based on the influence of Dr. Zvara. OSU also argues that, as to Dr. Zvara, Plaintiff presents no evidence demonstrating that his conduct was not based in fact, and that any suggestion that Dr. Harter was improperly influenced by Dr. Zvara is refuted by the fact that Dr. Harter recommended Plaintiff's reappointment despite Dr. Zvara's advice that he consider not reappointing her.

The Court agrees with OSU's contention that Plaintiff fails to create a genuine issue of fact as it relates to these issues. Simply because certain decisions were not made in her favor does not demonstrate pretext. Furthermore, the evidence Plaintiff cites does not create legitimate doubt as to whether there was a factual basis for the conduct taken against her, and Plaintiff fails to show that Dr. Harter acted at the behest of Dr. Zvara.

According to Plaintiff, Dr. Zvara acted adversely to her by writing letters to her that were critical of her performance. Plaintiff reasons that these letters were disciplinary in nature, and therefore constitute adverse action against her. Plaintiff also notes that Dr. Harter received copies of these letters, suggesting that they influenced his later decision to terminate her employment. Notwithstanding the issue of whether these critical letters were disciplinary in nature, Plaintiff fails to show that the substance of the letters was not based in fact.

Plaintiff also contends that Dr. Zvara "recruited others to help him manufacture support for discipline." (Doc. 159 at 81). But the evidence she cites for this proposition is Dr. Zvara's testimony that he asked people who made verbal complaints about Plaintiff to make them in writing. Contrary to Plaintiff's contention, this evidence does not indicate that Dr. Zvara asked others to report things that did not occur.

Plaintiff further suggests that her research time (non-clinical time) was unfairly decreased. However, she does not address the evidence indicating that, once Dr. Zvara became chair of the department, he instituted a general policy that each anesthesiologist would be allotted the same number of hours for non-clinical time. Additional hours for non-clinical time would be allocated if a particular anesthesiologist could demonstrate a source of funding for non-clinical time, such as grant money or institutional support, or if the anesthesiologist holds an administrative appointment, such as a directorship. Dr. Zvara conducted a review of the non-clinical time assignments for

every anesthesiologist in the department, including Plaintiff. He determined that Plaintiff had been awarded extra non-clinical time because she represented to the department that her research hours were funded by the Cardiology Department at OSU. Dr. Zvara testified that he contacted the Cardiology Department, and determined that no such funding was being provided. Based on this determination, and the fact that Plaintiff did not hold any administrative position to justify additional non-clinical hours, Dr. Zvara adjusted Plaintiffs non-clinical hours to the standard allotment within the department. Plaintiff has testified that, prior to Dr. Zvara's arrival, she secured grant money, which she shared with cardiac surgeons at OSU and Michigan. But this evidence does not dispute Dr. Zvara's testimony as to the information he gathered upon researching the matter. Thus, Plaintiff has not shown that this explanation is not based in fact or is otherwise pretextual.

Finally, Plaintiff asserts that Dr. Zvara should have selected her as Director of Cardiac Anesthesiology. However, OSU has presented evidence that Dr. Zvara selected Dr. Andritsos as Director of Cardiac Anesthesiology because he was the most qualified of the cardiac anesthesiologists for the position, including having the most support among other anesthesiologists. Plaintiff does not cite evidence to show that this explanation is pretextual, other than her own testimony that Dr. Andritsos was unqualified for the position because he was only two to three years post-fellowship. Plaintiff's subjective view that Dr. Andritsos was not the most qualified for the position because he had fewer clinical years of experience does not create a genuine issue of fact. *See, e.g., Hedrick v. Western Reserve Care System,* 355 F.3d 444, 462 (6th Cir.2004) (noting that a plaintiff's subjective view of her qualifications in relation to others, without more, fails to establish pretext).

For these reasons, the Court finds that Plaintiff has not presented evidence showing that Dr. Zvara's concerns regarding her performance were pretextual for unlawful retaliation or discrimination.

### 3. Dr. Harter

Next, the Court will address Plaintiff's argument that Dr. Harter's reasons for terminating her employment are pretext for retaliation and discrimination. Plaintiff argues that a jury could reject the reasons given by Dr. Harter for her termination. Dr. Harter has explained that he decided to terminate Plaintiff for the following reasons: late arrivals in surgery, unavailability, manipulation of the department schedule and violating department policy by calling in sick for doctor's appointments and vacations, problematic interactions with others, poor resident evaluations, and chart signing issues.

According to Plaintiff, she need only discredit one of the proffered reasons to meet her burden in demonstrating pretext. This may be true if discrediting the one reason creates substantial doubt as to the plaintiff's explanation and reasons for the adverse action. *See Smith v. Good Samaritan Hosp.,* No. 1:06–cv–207, 2007 WL 1974952 (S.D.Ohio July 3, 2007) (Barrett, J.) (finding that a showing that one of the two stated reasons for termination is pretextual is enough to meet plaintiff's burden in demonstrating pretext). The approach applied by this Court when there are multiple reasons given for a termination, such as in the case at bar, is whether the plaintiff "manages to cast substantial doubt on a fair number of them[.]" *May v. Pilot Travel Centers,* No. 2:05–cv–918, 2007 WL 108001, *6 (S.D.Ohio Jan. 5, 2007) (Frost, J.) (adopting the approach taken by Third Circuit Court of Appeals in *Fuentes v. Perskie,* 32 F.3d 759, 764–65, n. 7 (3d

Cir.1994)). A plaintiff may not need to discredit every reason because "the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." *Fuentes*, 32 F.3d at 765, n. 7. Thus, the issue is qualitative, not quantitative: the court must determine whether the plaintiff has presented sufficient evidence from which a factfinder could conclude that the defendant's explanation is false, and that discrimination was the real reason. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 512 n. 4, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("It is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.").

The reasons provided by Dr. Harter for Plaintiff's termination are addressed in turn.

### a. Late starts

■ Plaintiff argues that there is a genuine issue as to the truthfulness of this articulated reason for her termination. Plaintiff asserts that the data shows that there were four other employees in her sub-specialty who were late more often than her. When Dr. Harter was questioned regarding this data showing when surgeries started, he testified that he would receive reports from various sources that other anesthesiologists or residents would help facilitate the start of cases before Plaintiff arrived. These circumstances likely would not be reflected in the surgery start time data. The evidence indicates that the first surgery of the day would began at 7 a.m., and that the anesthesiologist would need to arrive before that time to take the appropriate steps to have the patient ready for surgery at 7 a.m. If Plaintiff or another anesthesiologist arrived late, efforts were made to keep the surgery on schedule. Thus, the late arrival of an anesthesiology would not necessarily be reflected in the surgery start time data. Plaintiff also argues that a jury would likely conclude that her late starts were due to extenuating circumstances. However, she does not present evidence showing that she was not frequently late to surgery, or that Dr. Harter did not receive complaints from others regarding her tendency to be late. Therefore, Plaintiff does not cast substantial doubt on this reason for her termination.

### b. Unavailability

■ Plaintiff argues that OSU's claim that she was terminated because of her general unavailability is discredited by the fact that OSU does not present evidence on this issue other than its own interested witnesses. That is, Plaintiff asserts that Defendant presents no supporting documentation to establish her unavailability and how it compared to the availability of other anesthesiologists. Plaintiff contends that OSU exclusively relies on the testimony of interested witnesses in its attempt to show a general theme of unavailability. Plaintiff also contends that a jury could believe her explanations for the times she was unavailable. Essentially, Plaintiff argues that the jury could disbelieve testimony regarding her unavailability or find weight in her explanation for being unavailable. These arguments are unpersuasive.

Plaintiff does not dispute OSU's assertion that there is evidence in the record that Dr. Harter received complaints from residents, nurses, and surgeons regarding her general availability or response times. Plaintiff attempts to discredit this evidence by asserting that it did not occur as frequently as suggested by OSU, that Dr.

Harter did not receive complaints from the doctors who testified, and that Dr. Harter did not recall which surgeons complained about her availability. But Plaintiff's attempt to discredit OSU's contention that her availability was a problem does not place into substantial doubt the evidence that Dr. Harter received complaints about her availability. Plaintiff argues that a jury would likely accept her explanations for the times she was unavailable, i.e. that she was either with another patient or her pager malfunctioned. However, Plaintiff's testimony regarding why she was unavailable at times does not negate Dr. Harter's position that her general lack of availability was a problem. Therefore, Plaintiff fails to cast substantial doubt on this reason for her termination.

### c. Manipulation of department schedule and violation of sick leave policy

 Dr. Harter testified that Plaintiff frequently manipulated the "call schedule" to her benefit and to the detriment of her colleagues. OSU has submitted airline records in an effort to confirm that Plaintiff had a practice of calling in sick when she was actually traveling. Plaintiff argues that Dr. Harter's assertion is unsupported by the record, thereby causing OSU to produce "after-acquired evidence" in the form of the airline records. But Plaintiff's argument misses the mark.

 Under the after-acquired evidence rule, evidence that defendants did not have at the time of the termination is not admissible to prove that the defendants fired plaintiffs for a legitimate reason. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). This rule does not prohibit an employer from citing evidence available prior to the employment decision. *See Edgar v. JAC Products, Inc.*, 443 F.3d 501, 513 (6th Cir.2006). According to Plaintiff,

because OSU did not have the airline records when Dr. Harter made the decision to terminate her employment, Dr. Harter's assertion regarding scheduling and use of sick leave is not supported by the record. But Dr. Harter did not testify that his suspicion that Plaintiff was calling in sick when she was not arose from his review of airline records.

Dr. Harter testified that there were times when Plaintiff would request not to be assigned clinical duty on specific days, was assigned clinical duty on the specified days, and then would call in sick on those days. Dr. Harter testified that Plaintiff would be "hostile towards [him], Dr. Andritsos, Dr. Lopez, to try and bully her way to get the time that she wanted." (Harter Dep. 113). These circumstances led Dr. Harter to suspect that Plaintiff was calling in sick when in fact she was not. Dr. Andritsos also testified that Plaintiff called in sick on a day that she had protested being on the schedule for that day. Significantly, while Plaintiff challenges Dr. Harter's testimony insofar as he does not specify how many times she called in sick under suspicious circumstances, who told him about it, and Dr. Harter's effort to investigate any improper use of sick leave, she does not dispute that she called in sick on days she had previously requested to not be on the schedule. There is no reason to dispute Dr. Harter's asserted suspicion that it was more than a coincidence that Plaintiff called in sick on days on which she previously had been denied requested leave. Under these facts, Plaintiff fails to cast substantial doubt on this reason for her termination.

### d. Interaction issues with others

 Dr. Harter testified that one of the reasons for Plaintiff's termination was her disruptive interactions with surgeons. Plaintiff argues that a jury would likely reject Dr. Harter's assertion that Plain-

tiff's disruptive interactions with surgeons was one of the reasons he terminated her employment. In support of this argument, Plaintiff asserts that there were systemic issues between cardiac surgeons and anesthesiologists, apparently suggesting that she should not have carried any of the blame for any issues between her and surgeons. Plaintiff also argues that other physicians at OSU had problematic interactions with others. However, Plaintiff does not dispute that OSU received complaints from staff indicating that she engaged in disruptive behavior, involving confrontational interactions with others and other unprofessional conduct. Plaintiff fails to show that this reason for her termination had no basis in fact.

### e. Poor resident evaluations

■ Dr. Harter testified that one of the reasons he decided to terminate Plaintiff was her poor resident evaluations. The record contains resident evaluations containing comments that do not cast Plaintiff in a favorable light as it relates to her interactions and supervision of residents. For example, the residents commented that Plaintiff was "[n]ot organized at all," that her "[t]hought process seems scattered," that she "[a]llways shows up late for the first cases making it difficult to get started on time," that she was "unprofessional," and that she "argues with surgeons and other attendings" and "displays erratic behavior in her interactions with others." (Doc. 177–7, Ex. VV). Additional comments of residents included the following: the "[d]ays I have been assigned to work with her have become a dreaded occasion, and that is unfortunate," and "is it possible to give lower than a 1 in this category [professionalism]?" *Id.*

Plaintiff argues that a jury would likely reject resident evaluations as a reason for her termination because other anesthesiologists had poor scores and comments from residents. Also Plaintiff argues that because she retained her academic position with the medical college, she was meeting OSU's expectations for teaching residents. It may be true that Plaintiff retained her academic post at OSU subsequent to her termination from clinical employment. But that fact does not cast doubt on OSU's reasons for not allowing Plaintiff to continue working in the clinical setting. Also, Plaintiff's arguments as it relates to poor resident evaluations does not show that this reason had no basis in fact. Her arguments really focus on the issue of whether the proffered reasons for her termination were insufficient to motivate the employment action, which will be discussed below. Therefore, Plaintiff fails to show that this reason was untruthful.

### f. Failure to timely sign orders

OSU asserts that one of the bases for Plaintiff's termination was her failure to timely complete and sign postoperative orders for patients. Dr. Harter testified that when he received reports that Plaintiff had not timely completed postoperative orders, he conveyed this information to her. Dr. Harter further testified that, instead of acknowledging the oversight or mistake, Plaintiff would be combative and would proceed to survey others to determine if they had ever not completed the orders. Dr. Harter found this disruptive and reflective of Plaintiff not taking ownership of an oversight or mistake. Plaintiff argues that this alleged reason was insufficient to motivate her termination and likewise did not motivate her termination. Plaintiff does not argue that Dr. Harter's view that she did not timely complete charts and postoperative orders did not have a basis in fact. Accordingly, this reason will be analyzed below in the context of determining whether the proffered reasons motivated the adverse action or

whether they were insufficient to warrant the challenged conduct.

### 4. Motivation for the Employment Action

Plaintiff argues that one or more of the reasons provided for her termination by OSU did not motivate her termination. Under *Manzer*'s second prong, Plaintiff can establish pretext by showing that it "was more likely than not" that OSU terminated Plaintiff based on an illegal motivation. *Manzer*, 29 F.3d at 1084. That is, Plaintiff must show "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* Plaintiff does not allege or present evidence showing that the "sheer weight of the circumstantial evidence" makes it "more likely than not" that OSU's explanation is pretextual. Plaintiff focuses her motivation inquiry and arguments in that regard on the third prong of the *Manzer* pretext test: whether the reasons given for the termination were insufficient to motivate the discharge because other employees not in the protected class were not subjected to the same adverse treatment under substantially similar circumstances. *Id.*

As outlined above, OSU has presented evidence that multiple reasons motivated Plaintiff's termination. Dr. Harter testified that he terminated Plaintiff's employment because of her late arrivals in surgery, unavailability, manipulation of the department schedule and violating department policy by calling in sick for doctor's appointments and vacations, problematic interactions with others, poor resident evaluations, and not timely signing postoperative orders. Dr. Harter has summarily testified regarding his decision to terminate Plaintiff's employment: "things had progressed to the point where the daily disruptions that she was creating for her colleagues was just intolerable ... I couldn't possibly follow-up on all of the issues that arose regarding her performance and behavior." (Harter Dep. 115). Dr. Harter further testified: "Of the hundreds of anesthesiologists I have supervised during my tenure, Dr. Nathan was far and away the most unproductive, unprofessional and disruptive." (Harter Aff. ¶ 7). It is clear, according to this testimony, the decision to terminate Plaintiff's employment was based on cumulative reasons, not alternative or independent reasons.

Plaintiff argues that a jury would likely reject, as the motivation for her termination, her alleged poor interactions with surgeons and others, resident evaluations, and untimely completion of postoperative orders, because other anesthesiologists had similar issues. In support of this position, Plaintiff has submitted a "comparison chart" to outline the performance and misconduct issues of other anesthesiologists at OSU. (Pl.'s Mem. in Opp'n App.). Plaintiff cites to this evidence as demonstrating that the reasons given for her termination are insufficient because others not in a protected class were not terminated from employment despite having performance and misconduct issues.

While the Court appreciate's Plaintiff's efforts in distilling pertinent information relating to the identified comparators, there are two obvious flaws in Plaintiff's comparator chart that must be noted. First, Plaintiff outlines, in bullet-point format, certain statistics or facts demonstrating apparent issues relating to each of these anesthesiologists. Plaintiff sprinkles her own statistics within these outlines. However, Plaintiff does not provide a more exhaustive outline enabling the Court to fully compare her own statistics with those of the comparators. Plaintiff also submits, and generally refers, the Court to the hun-

dreds of pages of documents that form the basis of the comparator charts. However, it is not the role of this Court to comb the record for pertinent information supporting Plaintiff's position. Second, Plaintiff includes data and information concerning the comparators for years following her termination from employment. OSU has presented evidence indicating that three of the comparator anesthesiologists (all three are male) were terminated by Dr. Harter after Plaintiff was terminated, and that he terminated an additional three during his tenure as Chair of the Department. These six anesthesiologists are all male. Plaintiff does not present evidence disputing this testimony, despite filing a surreply. Thus, despite providing statistics or facts relating to three of the doctors that Dr. Harter terminated, Plaintiff's chart does not account for the fact that these three were also terminated, albeit after Plaintiff's termination, by Dr. Harter. At least one of these three, Dr. Pacqualet, was terminated for professionalism issues.

Plaintiff asserts that there was general or frequent tension between the cardiac surgeons and anesthesiologists, and that other anesthesiologists had issues with professionalism. There is evidence in the record that, in addition to Plaintiff's hostile interactions with one particular surgeon, Dr. Sai–Sudhakar, there were other problematic interactions between anesthesiologists and surgeons. This tension resulted in the Chair of Surgery, Dr. Ellison to schedule a retreat for both departments to promote better communications between physicians in the two departments. Additionally, there is evidence in the record of other anesthesiologists receiving resident evaluations indicating professionalism issues. For example, according to the resi-

dent evaluations, one of the anesthesiologists was "volatile at times," another had no respect for trainees and treated them poorly, another berated a resident "ruthlessly" and had established a reputation for exhibiting a "sadistic attitude towards the house staff and medical students," another treated residents "like cattle" and was "condescending," and another was "hostile" and "unprofessional" toward residents. (Pl. Ex. MIO–20 at 1820, 1836, 1971, 2053, and 2143).

Plaintiff argues that there is serious doubt that OSU's claim that resident evaluations motivated her termination when other anesthesiologists had poor scores and comments from residents. But Plaintiff does not dispute the fact that OSU presents evidence that she received relatively poor evaluations from residents in multiple areas. She received the lowest educator rank report (teaching) scores among her colleagues (the comparators identified by Plaintiff) in 2006–2007 and 2007–2008. She was third lowest for these scores for 2008–2009. Dr. Nathan had the lowest average scores among her colleagues for resident evaluations in the areas of "organization" and "professionalism," covering the years 2006 through 2011. Plaintiff received the most number 1's (the lowest score possible) in the areas of "organization" and "professionalism," among her colleagues for the years 2006 through 2011.[4] Plaintiff also had the lowest score among her colleagues for clinical evaluations completed by residents in 2007–2008. (*See* OSU's Ex. XX).

Plaintiff does not challenge the accuracy of these resident evaluation statistics cited by OSU. Plaintiff argues, however, that the resident evaluation process is flawed because one anesthesiologist can submit

---

**4.** Resident evaluations include a 3 point scale, with 1 as "needs improvement," 2 as "effec-

tive as is," and 3 as "exemplary."

multiple reviews of one anesthesiologists and some residents may submit no review of that same anesthesiologist, and because the three point scale provides limited options for rating an anesthesiologist. Plaintiff argues that she was meeting expectations for resident education, despite the purported flaws of the system, in view of her receiving an "effective as is" score or above from every resident from July 1, 2007, until her termination. Plaintiff also cites various positive comments from residents on evaluations. The comments include the following: Plaintiff would "take residents aside and educate, which is nice," that she was a "pleasant attending," that it was "always nice to have Dr. Nathan work with residents on the TEE," that she did a "great job making sure I learned something from the day," that she was "very encouraging of residents," and "very enthusiastic about teaching," that she provided "excellent teaching," and was an "excellent teacher of echo. Very knowledgeable, arguably the best in the department," that she "went above the call of duty and gave extra lectures," that "she has an excellent demeanor with residents and enjoys teaching, which is appreciated," that "she took time out of her schedule to teach and discuss relevant articles during the case," that she "teaches every day, more than most attendees," "encourages independent thinking," and that "she is becoming more reliable and available, which is really appreciated." (Pl.'s Ex. 6).

Plaintiff's arguments are unpersuasive. OSU has presented evidence supporting Dr. Harter's view that Plaintiff had relatively poor resident evaluations. That Plaintiff received positive comments on some of her evaluations does not negate the relatively poor evaluations as to such matters as her organization and professionalism. Nor does Plaintiff's suggestion that the resident evaluation system is invalid and/or unreliable negate the reasonableness of Dr. Harter's assertion that he relied on the evaluations in arriving at his decision.

OSU has also produced a document charting the incident reports filed relating to Plaintiff and the comparators identified by Plaintiff, for the years 2006, 2007, 2008, and the first 6 months of 2009. According to this chart, Plaintiff had the most total incident reports filed in 2006, 2007, and 2008, and was tied for second highest number of incident reports filed in the first half of 2009. One of the incident reports includes statements that Plaintiff acted with "inappropriate and totally unprofessional behavior in the PACU this morning," and that "[k]nowing her moods, it was with great trepidation we went to the PACU to see if we could help [her] with a patient." (OSU Ex. UU).

Plaintiff argues that the event reports data is misleading because some of the reports involve the same incidents, numerous reports only tangentially mention her, and she otherwise disputes the bases of the reports. For example, she disputes the merits and underlying facts set forth in the reports, and she argues that OSU exaggerates the significance of the reports as it relates to her. It does appear that many of the incident reports merely cite Plaintiff's involvement in a circumstance that required follow up attention. And, contrary to OSU's suggestion, most of these reports do not necessarily constitute complaints against Plaintiff. Nonetheless, whether OSU properly calculated Plaintiff as having the most incident reports in support of its Motion for Summary Judgment does not change the fact that there are incidents reported that indicated Plaintiff acted improperly or otherwise in an unprofessional manner, and that Dr. Harter took this fact into consideration when deciding to terminate her employment. Significantly, Dr. Harter did not testify

that he decided to terminate Plaintiff's employment because of the number of incident reports that involved her. But he did specifically testify that Plaintiff engaged in disruptive conduct by negatively interacting with surgeons, including Dr. Sai–Sudhakar, and one of the incident reports details a circumstance involving Plaintiff and Dr. Sai–Sudhakar. Dr. Harter further testified that these altercations had the potential to adversely impact patient care.

Plaintiff argues that untimely submission of postoperative orders were such a systemic problem that Dr. Harter requested to be alerted when they were not entered, and a jury would likely conclude that Plaintiff's alleged failure to timely complete postoperative orders was an insufficient reason to motivate her termination. Plaintiff asserts that Dr. Harter testified that he had no reason to doubt her explanation that she had password problems in reference to an inquiry by him concerning certain incomplete postoperative orders when she was working at the James Hospital. Plaintiff's assertion that she had password problems one day may explain some delay in her completion of postoperative orders for one of the days. However, Dr. Harter's email to Plaintiff on April 14, 2009 indicates that there were subsequent days in which she failed to enter postoperative orders. Plaintiff does not dispute that she did not timely complete the postoperative orders as was asserted by Dr. Harter. Instead, Plaintiff argues that other anesthesiologists had issues with timely signing postoperative orders. Steven Smith, the Director of Anesthesiology, testified that most doctors had issues with signing and otherwise completing patient charts in an expeditious manner. He testified that "[t]here always has been issues with our physicians in charting and there always will be[.]" (Smith Dep. 33). Thus, Plaintiff essentially

reasons that because she was not the only anesthesiologist who failed to expeditiously sign and complete the necessary patient charts and orders, and in fact most doctors had issues with "charting," her failure to so act should not have motivated her termination. However, OSU presents testimony from Mr. Smith indicating that, on at least on occasion, he asked Plaintiff to complete charts in the coding office, and she flatly refused to sign the charts, and "stomp[ed] off." *Id.* at 120. On November 1, 2007, Mr. Smith received an email from a department employee stating: "Dr. Nathan has charts from 10/16/07 to be signed. The last time she was in she also had two weeks worth of charts to sign. She is our main procrastinator. Everyone else is usually in within 2 days of their page." (Smith Dep. Ex. 15). Plaintiff presents no evidence that any comparator had similar issues with completing charts and orders, or that any other comparator refused to complete charts when asked or surveyed others to investigate whether others had not expeditiously completed postoperative orders.

In the final analysis, Plaintiff fails to show that any other anesthesiologist, who was not also terminated, had the same level of issues relating to the performance of her or his duties as a clinician at OSU. Accordingly, the Court concludes that OSU has presented evidence in support of Plaintiff's termination, and Plaintiff fails to present evidence demonstrating that the asserted bases for her termination were pretextual.

## B. Retaliation under FMLA

Plaintiff alleges that OSU retaliated against her for exercising her rights under the FMLA. OSU argues that Plaintiff's claim of FMLA retaliation fails as a matter of law, contending, *inter alia*, that it is entitled to sovereign immunity under the

Eleventh Amendment to the United States Constitution as it relates to this claim. The Court finds that the claim is barred under the Eleventh Amendment.

 The Eleventh Amendment bars federal court actions against the state or its agencies unless the state waives its immunity or Congress abrogates it. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100–01, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). State universities, such as OSU, are covered by the state's Eleventh Amendment immunity. *Swanson v. Univ. of Cincinnati,* 268 F.3d 307, 313 (6th Cir.2001); *see Matteson v. Ohio State Univ.,* No. C2–99–1267, 2000 WL 1456988, *3 (S.D.Ohio Sept. 27, 2000) (Marbley, J.) (noting that it is well-settled that The Ohio State University is an instrumentality of the state of Ohio).

The FMLA "makes it unlawful for employers to ... retaliate against employees who exercise their FMLA rights." *Staunch v. Cont'l Airlines, Inc.,* 511 F.3d 625, 629 (6th Cir.2008). The FMLA entitles a qualified employee to twelve workweeks of leave during a twelve month period "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). This subparagraph is referred to as the "family-care" provision. The FMLA also entitles a qualified employee to leave "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). This subparagraph is referred to as the "self-care provision."

 The state of Ohio has not clearly waived its sovereign immunity from suit in the case of claims brought under the FMLA. *Thomson v. Ohio State Univ. Hosp.,* 5 F.Supp.2d 574, 576 (S.D.Ohio 1998) (Graham, J.). As a general matter, the state of Ohio has only consented to being sued in the Ohio Court of Claims pursuant to Ohio Rev.Code § 2743.02. Congress, however, has abrogated this sovereign immunity as it relates to certain types of FMLA claims, but not as to the type of FMLA claim asserted here.

 In *Coleman v. Court of Appeals of Maryland,* —— U.S. ——, 132 S.Ct. 1327, 182 L.Ed.2d 296 (2012), the United States Supreme Court held that "suits against States under [the self-care] provision are barred by the States' immunity as sovereigns in our federal system." *Id.* at 1332. Thus, Congress has not abrogated Eleventh Amendment immunity for claims brought against states under the self-care provision of the FMLA. The Sixth Circuit recently held, however, that the Eleventh Amendment does not bar suits for equitable, prospective relief against state officials in their official capacity for violation of the self-care provision. *Diaz v. Michigan Dept. of Corr.,* 703 F.3d 956, 964–65 (6th Cir.2013). As it relates to claims brought against states under the family care provision of the FMLA, Congress has abrogated Eleventh Amendment immunity for those claims. *Nevada Dep't of Human Resources v. Hibbs,* 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003).

In response to OSU's immunity defense set forth in its Motion for Summary Judgment, Plaintiff asserts that she has established that she took FMLA leave because of her mother's illness in March 2009, and therefore the claim is not barred by Eleventh Amendment immunity. In support of this assertion, Plaintiff cites her own affidavit, dated July 19, 2013. In said affidavit, Plaintiff stated that she "secured FMLA leave from Defendants ... because of [her] mother's illness" in March 2009. (Nathan Aff. at ¶ 32). Plaintiff contends that because this leave was taken under

the family-care provision, her FMLA retaliation claim is not barred by Eleventh Amendment immunity. Additionally, Plaintiff, citing *Minard v. ITC Deltacom Communications*, 447 F.3d 352 (5th Cir. 2006), argues that OSU should be estopped from asserting Eleventh Amendment immunity, or, at a minimum, a jury should be permitted to consider her claim for self-care FMLA retaliation regardless of OSU's status as a state institution, because OSU indisputably granted her FMLA leave for her back surgery.

OSU argues that Plaintiff's new theory of liability should be rejected as untimely, and that evidence in the record shows that her assertion that she requested, and was granted, FMLA leave in March of 2009 to care for her mother is a complete fabrication. In support, OSU points to the allegations made in the Amended Complaint, which do not reference her taking FMLA leave to care for her mother. OSU notes that Plaintiff was questioned at her deposition regarding her claim of FMLA retaliation, and that she did not indicate that she requested FMLA leave to care for her mother. (*See, e.g.,* Nathan Dep. at 290–95, 305–313). OSU also cites evidence it has produced indicating that Plaintiff did not submit an FMLA leave form for the days in question; rather she "called in sick" for the days in question. (Lopez Aff. at ¶ 4; Adams Aff. at ¶ 3). Thus, accordingly to OSU, not only is this new theory untimely, but Plaintiff's recently produced affidavit testimony is inconsistent with her deposition testimony and it is directly contradicted by the business records of OSU.

■■■ The Court rejects Plaintiff's attempt to circumvent the application of the Eleventh Amendment by belatedly asserting a claim under the family-care provision of the FMLA. A plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion. *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir.2007). That is, a "non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a)." *Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 788 (6th Cir.2005).

■■■ The FMLA retaliation claim alleged in the Amended Complaint is solely based on OSU's alleged retaliatory conduct due to Plaintiff taking FMLA leave for her own medical condition. Plaintiff's FMLA retaliation claim is premised on her request for leave for her own condition, that is, under the self-care provision. Plaintiff's Amended Complaint alleges that she had a serious health condition, that she availed herself of her right to FMLA leave as a result of her serious health condition, that she made a protected complaint of retaliation under the FMLA, and that OSU willfully discriminated and retaliated against her on account of her exercising FMLA rights and her protected complaint of retaliation. (Am. Comp. ¶¶ 73–77, Doc. 6). Plaintiff seeks damages for the alleged FMLA retaliation. Plaintiff's Amended Complaint makes no reference to Plaintiff requesting leave under the family-care FMLA provision. Thus, the Amended Complaint is unambiguous in that it does not allege a claim arising under § 2612(a)(1)(C), the family-care provision. Consequently, OSU was only on notice that she was asserting a claim arising under § 2612(a)(1)(D), the self-care provision. *Cf. Wysong v. Dow Chemical Co.*, 503 F.3d 441 (6th Cir.2007) (finding that district court erred in not considering FMLA claim under interference theory upon finding that the plaintiff's complaint stated

only a retaliation claim under the FMLA, when the complaint broadly alleged an FMLA violation, thereby providing sufficient notice that the plaintiff's FMLA claim could encompass either the interference theory, the retaliation theory, or both theories). And Plaintiff did not move to amend the Amended Complaint to include an FMLA retaliation claim based on the family-care provision of the FMLA. Now, in response to Defendant's Motion for Summary Judgment, Plaintiff seeks to asserts her new FMLA retaliation claim. Under *Tucker*, Plaintiff's attempt to assert a new claim is unavailing.

Therefore, even if there is some evidence in the record to support Plaintiff's assertion that she took FMLA leave in March 2009 to care for her mother, which is fervently disputed by OSU, the existence of said evidence does not negate the fact that Plaintiff's theory of liability under the FMLA was limited to the self-care provision of the FMLA until she was forced to respond to OSU's contention in support of its summary judgment motion that the Eleventh Amendment barred the claim.

Lastly, the Court rejects Plaintiff's reliance on *Minard*. In *Minard*, the Fifth Circuit held that an "employer who without intent to deceive makes a definite but erroneous representation to his employee that she is an 'eligible employee' and entitled to leave under FMLA, and has reason to believe that the employee will rely upon it, may be estopped to assert a defense of non-coverage, if the employee reasonably relies on that representation and takes action thereon to her detriment." *Id.* at 359. Plaintiff does not explain how this holding supports her contention that OSU is precluded from asserting a defense under Eleventh Amendment immunity as to her FMLA retaliation claim. Contrary to Plaintiff's suggestion, *Minard* does not

stand for the proposition that if a state employer grants FMLA leave to an employee, the employer is estopped from asserting Eleventh Amendment immunity as a defense to an FMLA retaliation claim made by the employee.

For these reasons, Eleventh Amendment immunity applies, and Plaintiff's FMLA retaliation claim is barred as a matter of law. Consequently, it is unnecessary to address OSU's alternative arguments for why Plaintiff's FMLA retaliation claim fails.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** OSU's Motion for Summary Judgment (Doc. 105). Accordingly, the Clerk shall enter final judgment in favor of OSU as to all of Plaintiff's claims.

The Clerk shall remove Documents 105, 178, and 181, from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**