NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0514n.06
Filed: June 17, 2005

No. 02-6434

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| HEATHER CHANDLER, | ) | |
| | ) | |
| Plaintiff - Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF TENNESSEE |
| SPECIALTY TIRES OF AMERICA | ) | AT GREENEVILLE |
| (TENNESSEE), INC., | ) | |
| | ) | |
| Defendant - Appellee. | ) | OPINION |
| | ) | |

_____

**Before: NORRIS and COLE, Circuit Judges; and ECONOMUS, District Judge.**[*]

**Economus, District Judge**

This is an appeal in a wrongful discharge case arising under the Tennessee Handicap

Act ("THA"), Tenn. Code Ann. § 8-50-103 (2004). Plaintiff Heather Chandler ("Chandler")

appeals 1) the district court's dismissal of her THA action on summary judgment, and 2) the

---

[*] The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

district court's failure to grant her partial motion for summary judgment. For the reasons stated below, we **REVERSE** the judgment of the district court.

## I.

In December 1998, Chandler filed a complaint alleging wrongful termination of employment in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et. seq.*, and the THA. On August 2, 1999, defendant Specialty Tires of America ("Specialty") filed a motion to dismiss or, in the alternative, for partial summary judgment as to Chandler's THA claim. The district court granted the motion to dismiss on January 7, 2002.

On February 18, 2002, a Tennessee jury found in favor of Chandler on her FMLA claim. Specialty appealed the jury verdict rendered for Chandler and Chandler appealed the district court's dismissal of her THA claim. This court upheld the jury verdict and reinstated the THA claim, holding that a genuine issue of material fact precluded summary judgment on the latter and "remand[ing] to the district court for trial on the THA claim." Chandler v. Specialty Tires of Am. (Tenn.), Inc., 283 F.3d 818, 824 (6th Cir. 2002) ("Chandler I").

Upon remand, Specialty and Chandler both filed motions for summary judgment in the district court. The court granted Specialty's motion for summary judgment, denied Chandler's motion for partial summary judgment, and subsequently denied Chandler's motion for reconsideration. This timely appeal followed.

## II.

2

In our opinion in <u>Chandler I</u>, we summarized the underlying facts of this case as follows:

Chandler was terminated from her job as a personnel assistant on May 22, 1998, while convalescing after a suicide attempt. Five days prior to her discharge, on Sunday, May 17, Chandler awoke, dressed her daughter, and attended church with her mother and stepfather. Following lunch at her parents' home, Chandler left her daughter with her parents, crossed the street to her own residence, and took an overdose of pills.

At nine o'clock that evening, Chandler's parents entered her unlocked house and found her lying semi-conscious on the bed. They rushed her to the emergency room where she was placed in intensive care. The next day she was transferred to Woodridge Hospital, where she was treated by Dr. Lee Ellen Naramore, a psychiatrist. During the week she was at Woodridge, Chandler kept in close contact with the plant manager, Joe McNeer. She told McNeer what had happened and that she needed time off for medical treatment; McNeer agreed to place her on paid leave. Nobody at Specialty indicated to Chandler that her job was in jeopardy. By the end of the week, she felt better and was planning to return to work the following Tuesday.

Robert Beck, personnel manager for Specialty and Chandler's immediate supervisor, learned of Chandler's intentional overdose on Tuesday, May 19. Believing that such behavior demonstrated a lack of responsibility, Beck concluded that he could no longer trust Chandler to handle the duties of her position and decided to terminate her employment. Beck testified that he had no knowledge of any diagnosis of illness, but based his decision entirely on what he characterized as Chandler's irresponsible act of taking an overdose of pills. He did admit, however, to knowing that she had been granted medical leave.

Beck drafted a termination letter on May 20, 1998. Chandler's ex-husband, Johnny Peterson, received the letter from McNeer on May 22, but did not deliver it to her until the 24th. On May 26, Chandler went to the office to get her possessions; while there, she had a tense conversation with Beck. Chandler requested that she be returned to her former position or given a similar position, but Beck refused.

3

Chandler I, 283 F.3d at 821-22 (footnotes and citations omitted).

## III.

### A.      District Court Compliance with Order of Remand

As a preliminary matter, we must determine whether the district court failed to comply with this court's prior order of remand by allowing Specialty to move for summary judgment on the THA claim. In Chandler I, after reversing the district court and ruling that the THA protected workers such as Chandler, this Court continued:

> Furthermore, we find that there is a genuine issue of material fact whether Beck fired Chandler because he regarded her as disabled. The undisputed evidence in the record is that Beck lost confidence in Chandler only after he discovered that she had taken an overdose of pills in a suicide attempt. His stated reason was that he thought her act of intentionally overdosing was irresponsible. Specialty has offered no evidence of a legitimate non-discriminatory reason for the termination other than to emphasize that Beck considered only her act of overdosing and not her mental condition. This unsupported explanation is not sufficient to overcome Chandler's evidence. Therefore, the case shall be remanded to the district court for trial on the THA claim.

Chandler I, 283 F.3d at 824 (citation omitted). The mandate of our opinion provided as follows: "[W]e **REVERSE** the district court's grant of summary judgment for Defendant and **REMAND** the THA claim to the district court for proceedings consistent with this opinion." Id. at 827. Chandler argues that this language directed the district court to hold a trial on her THA claim without allowing Specialty to file a second motion for summary judgment.

4

"The customary procedure on remand creates a duty on the part of lower courts, which obtain jurisdiction after receiving the mandate of an appellate court, to obey the terms of the mandate and to carry it into effect." Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Res., 71 F.3d 1197, 1202 (6th Cir. 1995) (citing 1B James W. Moore & Jo D. Lucas, Moore's Federal Practice ¶ 0.404[10] (2d ed.1993)). When a lower court is directed to proceed "consistent with [an appellate court's] opinion," then that entire opinion is incorporated into the mandate. Id. at 1201; see also Jones v. Lewis, 957 F.2d 260, 262 (6th Cir. 1992) (citing Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 949-50 (3d Cir. 1985). "Lower courts must then determine the scope of an appellate mandate, and in so doing they may consider majority and dissenting opinions, as well as issues not decided expressly or impliedly by the Court." Fort Gratiot, 71 F.3d at 1202.

Nonetheless, although a trial court is bound to "proceed in accordance with the mandate and law of the case as established by the appellate court," Hanover Ins. Co. v. Am. Eng'g Co., 105 F.3d 306, 312 (6th Cir 1997) (quoting Petition of U.S. Steel Corp., 479 F.2d 489, 493 (6th Cir. 1973)), an appellate court's decision reversing summary judgment on one issue does not preclude the district court, on remand, from granting summary judgment on other claims or issues not previously before the court of appeals. See Linton v. United Parcel Serv., 15 F.3d 1365, 1369 (6th Cir. 1994); Jones, 957 F.2d at 262-63.

In Chandler I, we directed our THA analysis towards determining whether the THA applied to the discriminatory termination of an employee in Chandler's situation. This is

5

substantively distinct from the district court's subsequent determination that Chandler could not establish a *prima facie* case of disability discrimination pursuant to the THA, an issue that we had not addressed. This issue of *prima facie* liability was never briefed before the district court, and was not reviewed by this Court in Chandler I. Accordingly, the district court appropriately allowed Specialty to move for summary judgment on this issue. See Linton, 15 F.3d at 1369 (holding that the district court had not erred on remand by granting summary judgment on a separate issue than that which the appellate court had deemed inappropriate for summary judgment); Jones, 957 F.2d at 262-63.

### B. The Tennessee Handicap Act

The THA, codified at Tenn. Code Ann. § 8-50-103, states in part as follows:

> There shall be no discrimination in the hiring, firing and other terms and conditions of employment of the state of Tennessee or any department, agency, institution or political subdivision of the state, or of any private employer, against any applicant for employment based solely upon any physical, mental or visual handicap of the applicant, unless such handicap to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved.

Tenn. Code Ann. § 8-50-103(a). Accordingly, a plaintiff alleging discrimination under the THA must show that he or she (1) is qualified for the position; (2) is disabled within the meaning of the THA; and (3) suffered an adverse employment action because of that disability. Barnes v. Goodyear Tire and Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000).

6

The Supreme Court of Tennessee has noted that the THA was enacted to prohibit discrimination in a manner consistent with federal civil rights law, and has advised Tennessee courts to "look to federal law for guidance in enforcing [Tennessee's] anti-discrimination laws." Id. Therefore, we may refer to cases that interpret the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 791, for purposes of interpreting the provisions of the THA. Finally, "[t]he THA embodies the definitions and remedies provided by the Tennessee Human Rights Act ("THRA")." Barnes, 48 S.W.3d at 705.

### 1.    Is Chandler Qualified within the Meaning of the THA?

An individual may be deemed qualified if the individual can perform, with reasonable accommodation, the essential functions of the position in question. Id. at 705 (citing 42 U.S.C. § 12111(8)). As Specialty appears to have conceded that Chandler is a qualified employee within the meaning of the THA, our focus shifts to whether Chandler suffered from a disability.

### 2.    Is Chandler Disabled within the Meaning of the THA?

In order to prevail, Chandler must demonstrate that she suffered from a physical or mental impairment that limited one or more major life activities, or that she was perceived or regarded as having such an impairment. Tenn. Code Ann. § 4-21-102(9)(A); Forbes v. Wilson County Emergency Dist., 966 S.W.2d 417, 420 (Tenn. 1998). The relevant inquiry in this case is whether Specialty regarded Chandler as being impaired. "While the

7

impairment may not have substantially limited a major life activity, the plaintiff may be regarded as disabled if the defendant treated [her] as if [her] impairment substantially limited a major life activity." Barnes, 48 S.W.3d at 706 (citing Sutton v. United Airlines, 527 U.S. 471 (1999)). Chandler may satisfy the statutory definition if Specialty mistakenly believed that she had an impairment that substantially limited one or more major life functions, or if Specialty mistakenly believed that an actual non-limiting impairment substantially limited one or more major life functions. Sutton, 527 U.S. at 489. In any event, the employer must "entertain misperceptions about the individual," which "often result from stereotypic assumptions not truly indicative of . . . individual ability." Id. This reflects Congressional recognition that "society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." Id. at 489-90 (citing 29 C.F.R. pt. 1630, App. § 1630.2(*l*)).

Here, Chandler contends that she was perceived as suffering from a mental impairment - depression - of which her attempted suicide was a symptom. She further suggests that this impairment would "substantially limit" her in the major life functions of caring for one's self, making reasonable decisions, and exercising sound thought and judgment. In Peters v. Baldwin Union Free School Dist., 320 F.3d 164 (2d Cir. 2003), the Second Circuit essentially adopted this argument, holding that "[a] mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself" and

8

concluding that it "therefore constitutes a protected disability" under the Rehabilitation Act. Id. at 168.

The district court rejected Chandler's contention, citing Maddox v. Univ. of Tenn., 62 F.3d 843 (6th Cir. 1995), for the proposition that an employer is "free to discharge an employee for conduct which he considers irresponsible as long as this legitimate (albeit heartless), non-discriminatory reason is the true reason and not a pretext for discrimination against an individual with a disability." In Maddox, this Court held that summary judgment was appropriate when the plaintiff, an assistant football coach who was fired after being arrested and charged with drunk driving and public intoxication, could not "establish the existence of a genuine issue of material fact with respect to whether he had been fired by reason of his status as an alcoholic rather than by reason of his criminal misconduct." Maddox, 62 F.3d at 845. Significantly, this Court distinguished between "discharging someone for unacceptable misconduct and discharging someone because of the disability," allowing that only the latter violates anti-discrimination statutes. Id. at 847. Applying this precedent to the facts before us, Specialty argues, and the district court found, that Beck fired Chandler because of her "unacceptable conduct" - to wit, her attempted suicide - rather than because of any perceived disability.

In light of the record in this case, we hold that the district court erred in determining on summary judgment that Chandler was not fired by reason of her perceived status as a person suffering from depression. Beck stated at deposition that his decision to terminate

9

Chandler stemmed from his belief that she could not perform any of her duties as Personnel Assistant, could not make "reasonable decisions . . . handle personnel files, pay, confidential information," was incapable of performing any of the 200 other manufacturing, administrative and clerical positions within the company, and because he could no longer trust her. In light of this laundry list of routine tasks that Beck believed Chandler could no longer handle, a jury could reasonably find that Beck believed her attempted suicide to be demonstrative of an inability to care for herself and, consequently, to perform the duties of her job. Peters, 320 F.3d at 168. The fact that Specialty did not use the words "mental illness" in describing the company's rationale for Chandler's termination does not lead to the conclusion that the company did not intuit some sort of perceived handicap from her attempted suicide. Rather, Beck clearly formed stereotypical assumptions about Chandler's ability to take care of herself and to perform her job on the basis of that suicide attempt. To embrace Specialty's position would require us to ignore the Supreme Court's admonishment that employers should pass judgment based upon an employee's "actual capacity" rather than upon a veil of "myths, fears, and stereotypes." Sutton, 527 U.S. at 489-90. Thus, we conclude that a reasonable jury could find that Specialty perceived Chandler as suffering from an impairment that limited one or more major life functions. Id. at 489.

### 3. Was Chandler Fired on the Basis of her Disability?

There is no dispute that Specialty dismissed Chandler because her immediate supervisor lost confidence in her ability to effectively perform her job based solely on the

10

fact that Chandler attempted to commit suicide. The central question is thus whether Specialty's termination of Chandler on this basis is sufficient to establish a *prima facie* case of disability discrimination pursuant to the THA. We conclude that it is.

For a claimant attempting to satisfy this *prima facie* element, there are "two evidentiary methods" that can be relied upon: "A claimant may either use the direct method or the indirect method." Barnes, 48 S.W.3d at 708 (citing Matthews v. Commonwealth Edison Co., 941 F. Supp. 721, 724 (N.D. Ill. 1996)). Under the direct method, a claimant relies on evidence that requires no inference or presumption to prove the existence of a fact. Id. If the evidence requires the jury to infer some further fact, it is not direct evidence. Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1081 (6th Cir. 1994). Once direct evidence of intentional discrimination is shown, the burden shifts to the employer to proffer a non-discriminatory reason for the employer's action. Barnes, 48 S.W.3d at 708; see also Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1184 (6th Cir. 1996) (eliminating the need for further burden shifting where direct evidence is available).

In contrast, the indirect method "employs the burden-shifting analysis developed in Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248 (1981)." Barnes, 48 S.W.3d at 708 (citations omitted). Under this method, once the claimant satisfies the *prima facie* elements through indirect evidence of discrimination, and the employer articulates a non-discriminatory reason for its action, the claimant must demonstrate that the proffered reason is actually a pretext for illegal discrimination. Id.

11

Although Chandler vehemently asserts that direct evidence supports her claim that her termination stemmed from a protected disability, we disagree. At no point did Beck, the supervisor who terminated Chandler, make any reference to a disability, or even admit to having any knowledge that Chandler was being treated for depression. Rather, Beck testified that he terminated Chandler because he felt her suicide to be "an irresponsible act" that caused him to "[lose] confidence in her ability to perform her duties." Although Chandler asserts that "the only rational conclusion which can be drawn from Beck's testimony is he perceived Chandler to be impaired due to her suicide attempt," implying that the act of suicide and the underlying disability are "inextricably interwoven," this is a clear example of the type of evidence that requires an inference to establish a fact. The jury, to conclude that Chandler had been fired on the basis of her disability, would have to infer from Beck's statements that he knew her suicide to be a symptom of a disability and believed that disability to limit her capacity to perform her duties. While Chandler argues that this conclusion is so obvious as to be the only "rational conclusion" that can be taken from Beck's statement, it is nonetheless a conclusion that must be reached by inference.[1]

---

[1] Chandler's argument boils down to her belief that the word "suicide" in Beck's testimony is merely a proxy for discriminatory concepts such as "depression" or "mental disability." She arrives at this conclusion by way of "undisputed medical proof" in the form of testimony given by Dr. Lee Ellen Naramore, the psychiatrist who treated Chandler, to the effect that "[t]he suicide attempt was one of the symptoms of depression, just like chest pain is a symptom of a heart attack. It's one of those things that you use to make the diagnosis." However, the very fact that Dr. Naramore's testimony is an essential step in linking Chandler's suicide to her depression demonstrates why Beck's statements constitute indirect evidence.

Therefore, we utilize the indirect evidence framework in evaluating whether Specialty terminated Chandler on the basis of a perceived disability.

The district court's order and Specialty's argument on appeal again focus on our prior ruling in Maddox. According to Specialty, Chandler's claim that her termination, based solely on her attempted suicide, constituted disability discrimination is inconsistent with Maddox's distinction between "discharging someone for unacceptable misconduct and discharging someone because of the disability." Maddox, 62 F.3d at 847. Specialty further argues that Chandler's situation is "not legally distinguishable" from that of Maddox in that both "engaged in unlawful off-duty conduct" that formed the basis of a supervisor's decision to terminate the employee.[2]

In Brohm v. JH Props., Inc., 149 F.3d 517, 521 (6th Cir. 1997), we contrasted Maddox and the Second Circuit's holding in Teahan v. Metro-North Commuter R.R. Co., 951 F.2d 511 (2d Cir. 1991). In Teahan, a district court ruled that an alcoholic employee who had been fired because of excessive absenteeism caused by his alcoholism had been terminated because of his conduct, not because of his disability. The Second Circuit reversed, holding that termination based on a factor closely related to a disability constitutes discrimination based solely on the disability. Teahan, 951 F.2d at 516. The Second Circuit analogized the case to that of a hypothetical employee with a limp that caused him to make a "thump" noise

---

[2] The basis for Specialty's assertion that Chandler's attempted suicide was "unlawful" is the company's belief that one of the drugs Chandler consumed was from a prescription bottle containing medication not prescribed for her.

when walking, stating that the limping individual's employer could not escape liability by articulating that he was fired because of the noisy "thump," rather than the limp. Id. at 516-17. Significantly, the court noted that a different result might ensue if the "thump" somehow rendered the employee unqualified for the position. Id. at 517.

In Brohm, we affirmed a district court's grant of summary judgment in favor of an employer that had fired a physician due to reports that he had fallen asleep during surgical procedures while administering anesthetics. Although the physician argued that he suffered from sleep apnea and that his termination stemmed primarily from his disability, we reiterated that an employer may fire a person for his conduct even if the conduct is related to that employee's disability:

> Brohm's conduct of sleeping while administering anesthetics severely diminished his ability to perform his job. Unlike the hypothetical limping employee [in Teahan], no reasonable inference may be made from the record in the present case that the hospital unfairly presumed that Brohm's disability would render him unqualified. Rather, the hospital had direct evidence that Brohm had been sleeping on the job, conduct which rendered him unqualified to perform his duties as an anesthesiologist.

Brohm, 149 F.3d at 521. Further stressing the distinction between disability-related conduct which affects an employee's job performance and that which would not, we noted that "Teahan's reasoning might be appropriate in a case where an employee with a disability is discharged for conduct unrelated to his job responsibilities . . .". Id. Thus, while our holding in Maddox is premised upon the reasonable conclusion that a disabled employee should not be allowed to violate workplace or societal rules any more than a non-disabled employee, our

14

ruling in Brohm allows for a finding of discrimination where an employer "unfairly presume[s]," based on disability-related conduct, that the disability renders an employee unqualified for his job. Id. Indeed, most of the cases that seemingly support Specialty's position involve the situation where an employer fired an allegedly disabled employee for violating a rule of conduct, whether work-related or societal, that impacted the employee's job performance. See, e.g., Williams v. Widnall, 79 F.3d 1003, 1007 (10th Cir. 1996) (holding that the Rehabilitation Act did not prohibit an employer from firing an employee for egregious conduct affecting the employee's "standard of performance," even where such conduct resulted from a disability); Collings v. Longview Fibre Co., 63 F.3d 828, 833 (9th Cir. 1995) (affirming discharge of employees for drug-related misconduct at the workplace); Despears v. Milwaukee County, 63 F.3d 635, 637 (7th Cir.1995) (affirming alcoholic plaintiff's demotion because he lost his driver's license as a result of driving drunk); Siefken v. Village of Arlington Heights, 65 F.3d 664 (7th Cir. 1995) (upholding summary judgment for an employer that fired a police officer for a failure to control his diabetes that caused the officer to carelessly drive his squad car at high speeds in residential areas).

Where Specialty's argument runs awry, therefore, is in its assumption that Maddox allows for the termination of a disabled employee for any disability-related misconduct, even if the conduct is not "unacceptable" or related to work performance. No court has held, and Maddox and Brohm cannot be said to have concluded, that an employer may rightfully fire an employee for disability-related conduct that is not related to work performance and does

not violate some work-place or societal rule. Rather, an employer should "tolerate eccentric or unusual conduct caused by the employee's mental disability, so long as the employee can satisfactorily perform the essential functions of his job." Den Hartog v. Wasatch Acad., 129 F.3d 1076, 1088 (10th Cir. 1997) (citing EEOC Enforcement Guidance: Psychiatric Disabilities and the Americans With Disabilities Act, 2 EEOC Compl. Man. (BNA), filed after Section 902, at 28 ¶ 30 (Mar. 25, 1997) (stating by way of example that an employer must make an exception to a general policy requiring employees to be neat and courteous in order to accommodate a mentally disabled employee whose job does not involve interaction with customers or co-workers)). We thus read Maddox and Brohm to permit a finding of discrimination where an employee suffering from a disability, actual or perceived, attempts suicide while outside of the workplace, and is then terminated on the basis of that conduct. Brohm, 149 F.3d at 521; Maddox, 62 F.3d at 848; Peters, 320 F.3d at 168.

It is significant to note that, prior to her suicide attempt, Chandler was a model employee who consistently performed her job duties in a satisfactory manner. Her treating physician, Dr. Naramore, testified that Chandler's suicide would not have prevented her from returning to her job and performing her duties to her usual level of competence. Thus, a jury could find that Chandler's suicide attempt did not limit her ability to perform those duties or render her unqualified for her job. Rather, Specialty, *vis a vis* Beck, apparently adopted the unsupported, stereotypical assumption that a person who would commit suicide is someone who cannot take care of themselves, make reasonable decisions, or handle their basic job

16

responsibilities. This is precisely the type of "stereotypic assumption[] not truly indicative of . . . individual ability" decried by the United States Supreme Court and the THA. See Sutton, 527 U.S. at 489. Accordingly, the district court erred in distinguishing between Chandler's conduct - the attempted suicide attempt - and the possibility that Specialty perceived her to have a disability.

### 4. Is Specialty's Stated Reason for Terminating Chandler a Pretext for Unlawful Discrimination?

Under the THA, once a plaintiff has established a *prima facie* case of disability discrimination, the burden then shifts to the employer to articulate a legitimate justification for its employment decision. Barnes, S.W.3d at 709. The plaintiff then must demonstrate that the employer's stated reason for its decision was actually a pretext for unlawful discrimination. Id. Specialty argues that, even if Chandler can succeed in establishing a *prima facie* case of discrimination under the THA, she cannot rebut Specialty's legitimate explanation for firing her; to wit, that the company lost confidence in her ability to perform her job duties as a result of her attempted suicide.

Chandler does not question Specialty's explanation that the company terminated Chandler because her supervisor lost confidence in her ability to perform her job duties, but argues that this is simply a regurgitation of the argument raised by Specialty in opposition to each element of Chandler's *prima facie* case. Specialty continues to cite Chandler's perceived disability-related conduct as the basis for its decision to terminate her despite our

17

conclusion, *supra*, that the assumptions formed by Specialty about Chandler's ability to perform her job duties following her suicide attempt could be perceived by a jury to be "stereotypic assumptions not truly indicative of . . . individual ability." Sutton, 527 U.S. at 489. Specialty's position is akin to the hypothetical employer in Teahan attempting to justify terminating the limping employee by asserting that the employee was fired because of the noisy "thump." Teahan, 951 F.2d at 516. In other words, where an employee satisfies the elements of her *prima facie* case by demonstrating that her employer has formed inaccurate stereotypic assumptions based on her disability-related conduct, it would defy logic to allow the employer to escape liability by citing those same assumptions as a legitimate justification for the termination.

Moreover, Chandler has provided evidence to rebut Specialty's proffered reason for her termination. In response to Specialty's statement that Chandler was no longer qualified for her position, Chandler has offered an affidavit from her treating physician declaring that "I do not believe the . . . attempted suicide . . . would in any way inhibit [Chandler's] ability to perform her job duties as a Personnel Assistant . . .". Dr. Naramore reiterated this point at trial:

> Q:    When Ms. Chandler was discharged in May of 1998 from Woodridge by you, were there any medical or psychological reasons which would have prevented her from returning to her old job?
>
> A:    Not at that time.
>
> Q:    Were there any medical or psychological reasons that would have prevented her from making reasonable decisions?
>
> A:    No.

18

Q: What about rational decisions?

A: No.

Q: What about maintaining confidences?

A: No.

Q: What about maintaining trust?

A: No.

Q: Any problems with communication?

A: None at all.

Q: Any problems with writing skills?

A: None.

Additionally, one of Specialty's managers, Joe McNeer, stated at deposition that Chandler had always performed her job duties at a very high level and had complied with all applicable company policies when she needed to take time off following her suicide attempt. Finally, Beck himself indicated that nothing in Chandler's past performance, other than the attempted suicide, had ever given him any reason to doubt her ability to maintain confidences, handle payroll and other documents, and make reasonable decisions.

No one at Specialty has ever provided any evidence that the suicide attempt had any actual demonstrable effect on Chandler's ability to satisfy the requirements of her job upon her return to work, nor has Specialty given any other legitimate reason for terminating her. Perceptions of disability resulting from Chandler's attempted suicide were thus the clear reason behind her termination. Accordingly, we find that no reasonable jury could conclude anything other than that Specialty terminated Chandler specifically on the basis of

19

stereotypical assumptions about the disability it perceived her to have. Chandler is thus entitled to summary judgment on her THA claim.

## IV.

For the foregoing reasons, the judgment of the district court both granting summary judgment in favor of Specialty on Chandler's THA claim and denying Chandler's motion for summary judgment on that claim is **REVERSED** and this matter is **REMANDED** for further proceedings consistent with this opinion.