NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0470n.06

No. 20-4308

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 15, 2021
DEBORAH S. HUNT, Clerk

MELANIE LOCKHART,

    Plaintiff-Appellant,

    v.

MARIETTA CITY SCHOOLS; WILLIAM
HAMPTON,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF OHIO

Before: GRIFFIN, WHITE, and READLER, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Plaintiff Melanie Lockhart appeals the district court's grant of summary judgment to her former employer, Marietta City Schools, and the District's Superintendent, William Hampton, on her disability-discrimination and failure-to-accommodate claims. We AFFIRM.

**I.**

Plaintiff Melanie Lockhart worked as a middle-school physical-education teacher for the Marietta City School District ("the District") from the year 2000 until February 2019, when her employment was terminated. The events leading to Plaintiff's termination began in January 2018. While shoveling snow on the morning of January 13, 2018, Plaintiff experienced what she describes as a "deeply religious event," R. 54-1, PID 1668, in which she lost consciousness and was lifted up and carried eight to ten feet away, by what she believes was a "supernatural power,"

R. 48, PID 1015. Lockhart claims that during this experience she saw several different visions and felt that "God entered [her] body." R. 54-1, PID 1668. She also says that immediately upon experiencing the event on January 13, 2018, she felt relief from chronic back pain that she had suffered with for the previous year and felt that God had healed her. Lockhart believes God wanted her to share her experience with others and help those who could be touched by her experience, and that God was attempting to speak through her.

The days immediately following the event were snow days, so Lockhart did not return to work until Friday, January 19. When Lockhart returned to school, she shared her experience eagerly with students and staff. According to Lockhart, when she walked into the classroom, one of her students asked her what happened to her and whether she had had a near-death experience over the weekend. She said to her students, "I'm not preaching God. I'm telling you my story. What you choose to take from it is your choice," and then she told them about her experience. R. 48, PID 1021. Lockhart also sought out Principal Brittany Schob to share her story and to tell Schob that she may need to host a staff meeting to inform the school staff about her experience. Schob testified that Lockhart came into her office and told her that "He had gotten inside of her, she went into the air and her body did moves that it had never done before . . . and then she said that since then her pain had gone away, and the only way that she could keep her pain away was if she continued to tell people about her episode." R. 51, PID 1336. According to Schob, Lockhart did not explain who she was referring to when she said "He," and Schob did not know that Lockhart was referring to God. Schob found out later that day from one of her secretaries that Lockhart had kept a class of eighth-grade students for twenty minutes past the end of the period to tell them about her experience, making them late for other classes. Schob did not discipline or otherwise warn Lockhart regarding her conduct that day.

2

That evening and over the weekend, Lockhart exchanged long emails with two students about her "visions" and her belief that God was happy with the students' positive response to her story. According to Schob, on Monday a parent came to her with concerns about a conversation her daughter had with Lockhart in which Lockhart told the girl that she "knew her and her mom had a strained relationship and they were having difficulty and she was going to help her with that, and she understood why her and her mom weren't getting along." *Id.* at PID 1343. The parent indicated that her daughter had spent hours talking to the family's preacher and was "distraught" about what Lockhart had said. *Id.* That day, Schob approached Lockhart and told her that she "wanted her to be careful in what she was saying." *Id.* at PID 1344. According to Schob, when she walked into Lockhart's office, Lockhart stated that "she knew [Schob] was coming, that He told her [Schob] would be coming" and asked Schob to sit down. *Id.* at PID 1345. Lockhart told Schob that she "could feel what was happening inside of" Schob and asked to hold Schob's hand so that she could feel what Schob was feeling. *Id.*

That night, following a Board of Education ("Board") meeting, Schob asked Superintendent Hampton if they could meet to discuss a concern she had about a teacher, and Hampton said that he would stop by to speak to Schob at school the next morning. Schob and Hampton met first thing the next day, and Schob informed Hampton about the conversations Schob had with Lockhart about her experience, about the conversations Lockhart had with her students, that Lockhart had kept a class after the bell to discuss the experience with them, and that there were parents who had expressed concerns over Lockhart's discussions with their children. Hampton told Schob that he needed to follow up on some things back at his office, and to keep him updated.

After the meeting between Schob and Hampton, Lockhart came into Schob's office. Schob told Lockhart that she was concerned, and Lockhart told Schob not to worry, that the school was going to "make national news." *Id.* at PID 1355. According to Schob, Lockhart asked Schob to have Hampton come to meet with her so that he could hear about her experience, and kept repeating we are "going to make national news." *Id.* Lockhart's comments alarmed Schob and she believed that Lockhart might pose a threat to the safety of students and staff. Schob immediately called Hampton to update him regarding Lockhart's comments. Later that morning, Hampton held a meeting with Lockhart, Schob, and several others to discuss Lockhart's conduct.

During the meeting Lockhart enthusiastically shared her January 13 experience and was open about the fact that she had also shared her story with some students at the school. Hampton asked Lockhart about her comment, "we are going to make national news" and testified that Lockhart would not give a straight answer regarding what she meant, saying "I cannot tell you, but we are going to go to court" and that Lockhart would be the first to testify, and they would win. R. 50, PID 1127. Hampton explained at his deposition that there had been a series of school shootings around that time, that everyone was on alert for potential warning signs, and that he considered that Lockhart might be a threat. He testified that Lockhart's reluctance to give an explanation for her statement about making national news was concerning because "there aren't many ways that schools do make the news nationally unless it's tragic." *Id.* at PID 1130. Hampton asked Lockhart whether she was taking any medication or drugs, because he believed that might explain her behavior. At that point Lockhart revealed that she used marijuana in the past for pain relief. Hampton described the meeting as "the most bizarre experience" he had ever had. *Id.* at PID 1128. At the conclusion of the meeting, Hampton unilaterally made the decision that Lockhart would be placed on paid administrative leave and produced a letter that had been prepared prior to

4

the meeting (in case it was needed) informing Lockhart of the decision to place her on paid administrative leave. The letter stated, in part:

> This letter is to confirm in writing that you have been placed on paid administrative leave immediately and until further written notice, pending investigation into matters related to your employment . . . .
>
> During this period of leave, you are not to be on school grounds and you are not to attend any functions of the Marietta City Schools, whether on school district property or at any other location. You are not to access school equipment, computers, or services. You are not to communicate by any means, or through any other person, with the students of the Marietta City Schools or their parents/families regarding your employment. You must not engage in any communications with other Marietta City School District employees on matters related to your employment, this investigation, or this leave; except that you may communicate with union representatives. If you violate this directive, it will constitute insubordination and may result in disciplinary action up to and including termination of your employment.

R. 50-10, PID 1250.

The next day, January 24, 2018, Schob and Hampton were contacted by the Washington County Sheriff's Office after a concerned citizen contacted law enforcement about one of Lockhart's Facebook posts, which stated:

> I NEED you ALL, to know that you will be seeing and hear [sic] some things about me in the NEAR future. I may sound crazy but I need you to believe in me. You will JUDGE and you will say you don't believe. I need you to see this as I know what is about to happen will be in the National News. DO NOT WORRY ABOUT ME I AM NOT SCARED! You will learn things about me that I am ok with you knowing. Again, DO NOT JUDGE ME. I can NOT and will NOT be able to speak to any of my colleagues or students about this no matter of [sic] our relationship and you are not to contact me as I can NOT respond! I can NOT and will NOT use FB to communicate to the rest of you. I need you ALL to believe in me. This is going to be the BEST RIDE of my life !!! I am so excited for this and you will all understand when its [sic] over.
>
> I NEED everyone to share this. I NEED people to see my face and learn my name. Share share share. I ASK that you do it for me.
>
> I know several of you will contact my family about what is going on[.] They will know what to tell you and I believe in them. I NEED to leave you with this
>
> I HEAR I FORGET
> I SEE I REMEMBER
> I DO I UNDERSTAND
> I LOVE YOU ALL!!!!

R. 44, PID 638. Due to the content of the post, the fact that Lockhart had just been placed on administrative leave, and a recent school shooting that was in the national news, the Deputy Sheriff became concerned. This prompted the Sheriff's office to dispatch a sergeant, escorted by the local police, to perform a wellness check on Lockhart at her home in West Virginia. The police concluded that Lockhart was not a threat to herself or others.

Shortly thereafter, the District decided to hire licensed psychologist Fred Lee to evaluate Plaintiff's mental-health status and determine her fitness for duty as a teacher. On February 8, Hampton sent a letter to Dr. Lee's office describing Plaintiff's recent conduct and outlining the particular concerns the District wanted Lee to address. Hampton indicated that the "specific job duties and responsibilities" about which the District had concerns were Lockhart's ability to: (1) "instruct students in a healthy, safe learning atmosphere," (2) "[t]o limit her discussions with students to the curriculum and to avoid any discussion of her religious experiences and beliefs, as required by law," (3) "[t]o exhibit professional behavior, emotional stability, and sound judgment both in the classroom and when interacting with other staff members and members of the community," and (4) "[t]o refrain from proselytizing or discussing her religious beliefs/convictions with students or at school, as required by law." R. 50-14, PID 1261.

In the meantime, Lockhart arranged for her own psychological evaluation with supervised psychologist Amber Davis on February 16 because she did not "trust the results from the practice at which her employer" required her to be assessed. R. 60-1, PID 1753. The report issued by Davis included the following relevant observations: "She is grandiose, and mood is very elevated . . . Her associations are loose. Grandiose delusions seem to be present . . . Insight into problems appears to be poor. Judgment appears to be poor." *Id.* at PID 1755. Davis diagnosed Lockhart with "[u]nspecified disorder of adult personality and behavior," "[o]ther psychotic disorder not

due to a substance or known physiological condition," risk of "Bipolar disorder, current episode manic severe with psychotic features," and risk of "Schizophrenia, unspecified." *Id.* at PID 1756. Davis concluded that Lockhart's treatment prognosis is fair if she "follows treatment recommendations" including considering "[m]edication management . . . as well as psychotherapy," but noted that "Lockhart may be convinced that if she is left alone and does not go through therapeutic treatment, that she could work out her problems independently," which would likely "lead to backsliding and recurrences of her socially-unacceptable behavior." *Id.*

On February 22, Lockhart attended the evaluation with Dr. Lee arranged by the District. Dr. Lee issued an initial report to the District on February 26. The report concluded that Lockhart's performance during the evaluation signaled a "breakdown in reality testing and the ability to think logically and coherently," and revealed a "Pollyanna kind of denial aimed at keeping oneself in good spirits by warding off and refusing to acknowledge the existence of depressing feelings." R. 34-2, PID 147. Lee advised that Lockhart would "benefit from a psychiatric review and medication regimen and monitoring." *Id.* Hampton followed up, requesting Lee's specific opinion as to whether Lockhart's "mental, physical, or psychological condition . . . [would] render her unable to perform the essential functions of her current position as teacher, with or without reasonable accommodation, within the confines of the laws and rules."[1] R. 50-18, PID 1281. Lee issued a second report on March 6, in which he opined that he did "not regard [Lockhart] as capable of performing the essential functions of her current position as teacher and within the legal and ethical boundaries of Marietta City Schools and her profession." R. 34-2, PID 142. Lee's reports

---

[1] According to Dr. Lee's testimony at the administrative hearing, he understood "the laws and rules" to refer to a document that Hampton sent him "specifying what the job requirements were for Mrs. Lockhart." R. 39, PID 461. This document is referenced in the fax Hampton sent to Lee requesting his evaluation of Lockhart but is not included in the record.

also included a more in-depth analysis of Lockhart's condition, including that "[d]iagnostically she exhibits a Bipolar I Disorder, Manic Type with Psychotic features." *Id.* at PID 142, 145–46.

On March 20, 2018, Plaintiff attended a pre-disciplinary meeting with the District, in which the District raised four allegations against her: (1) "admitted" and "recent[]" use of marijuana; (2) "using your position as a teacher for [the District] to discuss, share, and teach about your religion/your religious beliefs with students and others during the student instructional day"; (3) "[e]ven though you are aware that you are not to discuss your religious beliefs, experiences, etc. at school and with students, you affirmatively stated that you no longer have control over what you say (indicating that God tells you what to say and to whom)"; and (4) Dr. Lee's professional opinion "that you are not capable of performing essential functions of your position as teacher." R. 50-22, PID 1291.

While on paid leave, both before and after the first pre-disciplinary meeting, Lockhart communicated privately with students over Facebook message, despite the District's clear instructions not to do so. After her initial pre-disciplinary meeting, she sent a twelve-page message to one of her students, saying, in part:

> Hey beautiful. I hope you are doing well. I am doing great!! So sorry I abandoned you and the other students. I was forced to leave. Do not trust Mrs. Schob, Mr. Fleming and even Mr. Benson. My heart aches for them and what they have done that has not been right with removing me from the school. There is so much to this. They along with the Superintendent have lied about things and I have proof. They don't understand my gift and what I know. . . . Please do not ask or talk to any of them about this until after Monday evening.

R. 46, PID 687. Plaintiff also told this student that her visions allowed her to solve murder cases.

At around the same time, Plaintiff sent a similar message to a different student, saying:

> Morning beautiful! I need you to know I am not angry at you. You have NOT done anything wrong. I love you. I know your heart is filled with sadness and you think you let me down. You did everything RIGHT. What zi [sic] do need is your mom to call me ASAP. Your mom has a law suit against the school for what they just did to you. [redacted]. They violated your rights and did it all wrong according

to the law. She needs to call me now!!! This is very important, listen to your heart and trust me. I told you that Mrs. Schob, and Ms. Fleming could not be trusted. This was all in his plan, believe me. . . .

I want you to enjoy your trip and remember, they (schob, fleming, hamton [sic]) told you when they pulled you [to] the office after school hours, to let them know if I contacted you. They may [sic] even threatened you or tried to make you think I brainwashed you. You, me and God know what happened when I told my story . . . .

You do not have to do as they tell you. This is bullying at its finest. You are a victim. There is so much to all of this and you are only hearing their side of the story, what they want you to hear. DO NOT BE AFRAID TO STAND UP FOR YOURSELF. Do not tell anyone that I contacted you. They will go behind your back and tell again because they think they can trust them. Trust me, IAM [sic] THE ONE YOU NEED TO TRUST. Please just enjoy the rest of your trip and just put this behind you until you get home. I dearly love you. Have they told you that they love you? Know that Mrs. Lockhart does.

*Id.* at PID 657–66. There were a number of other similar messages sent by Lockhart to students at the school. For example, as part of a longer message, Lockhart asked another student to "do [her] a favor" "on the down low" and "try to get as many students and parents" as possible to show their support for her at the Board meeting. *See* R. 45. In asking the student to do so, she referenced prior detentions the student had received and said that the student knew what it was like to be "falsely accused of something." *Id.*

On March 28, 2018, the District sent Lockhart notice of a second pre-disciplinary hearing, to take place on April 4, 2018, which added the following allegations:

1. On or about January 23, 2018, you were placed on paid administrative leave pending an investigation into allegations of misconduct. The letter expressly advised you that, among other things, "you are not to communicate by any means, or through any other person, with the students of the Marietta City Schools or their parents/families regarding your employment." Beginning [on] or about Saturday, March 24, 2018, and continuing thereafter, you communicated by text message with a student of Marietta schools about your employment and various other issues related to your employment.

2. It is also believed that you have been in contact with other students of Marietta Schools about your employment and related matters.

3. Given your persistent refusal to comply with the directives given to you, there may be additional evidence of the foregoing misconduct and/or additional

> allegations of misconduct that arise between now and the meeting. If so, these allegations and evidence will be presented to you.

R. 34-4, PID 171. Lockhart attended the April 4, 2018 meeting and was given the opportunity to respond to the allegations against her. Lockhart admitted having had contact with a student following the issuance of the second pre-disciplinary-hearing meeting notice. Following the April 4 meeting, Lockhart was given written notice that Hampton would recommend termination of her employment at a Board of Education meeting scheduled the next day, and that she would immediately be placed on unpaid leave pending Board action on the recommendation. The notice set forth a summary of the reasons for the recommended termination:

> These allegations, which were set forth in the pre-disciplinary meeting notices provided to you, involved your admission to the illegal use of marijuana, your misconduct in using your position as a teacher for the Marietta City Schools to discuss, share, and teach about your religion/your religious beliefs with students and others during the student instructional day and at other times, and your defiance of the directive not to communicate with students of Marietta Schools about your employment and related matters while you were on paid administrative leave (both before and after you were issued the second pre-disciplinary meeting notice). In addition, Dr. F. Lee conducted a fitness for duty examination on February 22, 2018, and found that you are not fit for duty.

R. 34-5, PID 173.

Lockhart appeared at the April 5 Board meeting with legal counsel and read a prepared statement. Of relevance here, Lockhart asserted that upon being informed of her disability, the District was required, under Ohio law, to take certain steps (which it did not take) rather than terminating her employment. She cited the Ohio School Boards Association reference guides, which provide that an employee who is determined to have a physical or mental disability may be placed on involuntary leave for up to two years. She claimed that all the allegations against her stemmed from her newly discovered disability, and that the District was improperly seeking to terminate her employment rather than offer her accommodations. After Lockhart was heard, the Board voted to accept Hampton's recommendation to proceed with termination proceedings

against Lockhart and to suspend her without pay pending resolution of those proceedings. After being notified of the Board's decision, Lockhart requested a public hearing before a referee. The District scheduled a hearing before referee David Hipp, which was held on December 4, 2018. Schob, Hampton, Lee, and the school's assistant principal testified for the District. Lockhart testified and also called her union representative J.D. Benson, Officer George Gragan (the school resource officer for the Marietta City Police Department), her husband Robert Lockhart, Robert Pifer (the officer who conducted a wellness check on Lockhart in February 2018), and Troy Hawkins (the Deputy Sheriff with the Washington County Sheriff's Office who coordinated the wellness check).

When asked to clarify what she meant when she said that the school would be in the national news, Lockhart answered, "what I meant was, we were going to be in the news, we were to be in the paper, we were going to be on television, and it's going to spread like wildfire throughout the United States. That's what—in terms of—what was happening." R. 39, PID 201. She clarified that she did not mean anything "violent." *Id.* Lockhart testified that she had smoked marijuana "on [her] personal time in the summer" to address back pain prior to a scheduled back surgery. *Id.* at PID 509. She also provided the following testimony regarding her discussions with students about her religious experience:

> Q. Did you ever use your position as a teacher to discuss sharing and teaching religion and religious beliefs?
>
> A. No. I told my story.
>
> Q. Did you say you no longer have control over what you have to say?
>
> A. At that time, yes, I was just learning what was going on and how to control it. At that time, I said yes. But as of now I understand everything. I can control. I know exactly what's being told of me, and I understand everything.

*Id.* at PID 525. She explained that she has to "follow his orders to remain pain-free," and when asked to clarify "his" identity, she resisted a reference to "God" and said "he" is her "provider"

11

who "gives [her] guidance and strength." *Id.* at PID 562. She then explained that she is "definitely" in "control of [her] thoughts and actions," "capable of teaching students," and "capable of not discussing religious matters during instructional hours." *Id.* at PID 568.

Following the administrative hearing, Referee Hipp issued a Report and Recommendation, finding that Lockhart's teaching contract should be terminated.[2] On February 25, 2019, the Board adopted a resolution to accept Referee Hipp's recommendation, and Lockhart's employment was officially terminated. The Board gave three "separate, independent" grounds for the termination of Lockhart's employment contract: (1) "[o]n various dates in January 2018, and possibly earlier dates, Ms. Lockhart used her position as a teacher for Marietta City Schools to discuss, share, and teach about her religion/your religious beliefs with students and others during the student instructional day;" (2) "[e]ven though Ms. Lockhart was aware that she was not to discuss her religious beliefs and experiences at school and with students, she affirmatively stated that she no longer has control over what she said (indicating that God tells her what to say and to whom);" and (3) "[a]fter Ms. Lockhart was directed that she was not to discuss her employment and related issues with, among others, students of Marietta Schools, she did, on more than one occasion, correspond with students of Marietta Schools and discussed her employment and related issues." R. 50-29, PID 1311.

Lockhart filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued a Right to Sue letter. In July 2019, Plaintiff filed suit alleging: disability-discrimination in violation of Ohio Rev. Code § 4112.01 (Claim 1); disability-discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 (Claim 2); religious discrimination in violation of Ohio Rev. Code § 4112.01 (Claim 3);

---

[2] The Report and Recommendation itself is not included in the record.

12

and retaliatory discrimination in violation of Ohio Rev. Code § 4112.01 (Claim 4).[3] Defendants moved for summary judgment on all claims. Although Lockhart did not articulate a separate claim for failure-to-accommodate, the district court considered an accommodation claim because both parties made arguments regarding failure to accommodate at summary judgment, and because the Complaint contained facts and arguments related to such a claim.

Because Ohio's law governing claims for disability-discrimination "parallels" the Americans with Disabilities Act ("ADA"), the district court considered Claims 1 and 2 together, applying the federal statute. First, the district court considered Lockhart's disability-discrimination claim under the burden-shifting framework applicable to discriminatory-discharge claims. The district court found that Lockhart failed to "cast substantial doubt" on any of Defendant's reasons for terminating her, and thus that Defendants were entitled to summary judgment on Claims 1 and 2. R. 69, PID 1883 (quoting *Nathan v. Ohio State Univ.*, 984 F. Supp. 2d 789, 801-02 (S.D. Ohio 2013), *aff'd*, 577 F. App'x 544 (6th Cir. 2014)). The district court separately found that Lockhart had not presented sufficient evidence to withstand summary judgment on the failure-to-accommodate claim. The district court exercised discretionary jurisdiction over Lockhart's remaining state-law claims and determined that Defendants were also entitled to summary judgment on Claims 4 and 5.

## II.

We review a district court's grant of summary judgment *de novo*. *Med. Mut. of Ohio v. k. Amalia Enters. Inc.*, 548 F.3d 383, 389 (6th Cir. 2008). "Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine

---

[3] In December 2019, Lockhart began substitute teaching for two other school districts until they closed in March 2020 due to the COVID-19 pandemic.

issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quoting *Mazur v. Young*, 507 F.3d 1013, 1016 (6th Cir. 2007)).

"ADA discrimination claims are analyzed under two different rubrics, depending on whether the plaintiff relies on 'direct' or 'indirect' evidence of discrimination." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020). Where a disability discrimination claim is premised on indirect evidence, it is analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004). To state a prima facie case of disability discrimination, a plaintiff must show "(1) she is disabled; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse action; (4) the employer knew or had reason to know of her disability; and (5) she was replaced or the job remained open." *Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012). Once a plaintiff presents a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 813 (6th Cir. 1999). Then, the burden shifts back to the plaintiff to show that the proffered reason is pretext for unlawful discrimination. *Id.* It is the plaintiff's ultimate burden to show that she was terminated "on the basis of disability," 42 U.S.C. § 12112(a), meaning she must show that her disability was a "but-for" cause of her termination. *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc).

In disability-discrimination cases in which a plaintiff puts forward direct evidence of discrimination, it is not necessary for "the fact finder to draw any inferences [to conclude] that the disability was at least a motivating factor." *Fisher*, 951 F.3d at 416 (quoting *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018)) (alteration in original). Under the direct evidence

framework, a plaintiff bears the burden of establishing "(1) that [s]he is disabled, and (2) that [s]he is 'otherwise qualified' for the position despite [] her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Id.* at 417 (quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 869 (6th Cir. 2007)). The employer then bears the "burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Hedrick*, 355 F.3d at 452 (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)). "Because failure to accommodate is listed in the Act's definition of disability discrimination, *see* 42 U.S.C. § 12112(b)(5)(A), 'claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination.'" *Fisher*, 951 F.3d at 416 (quoting *Kleiber*, 485 F.3d at 868).

**A.**

Lockhart's disability-discrimination claim is premised on the District's termination of her contract. Because plaintiff has presented this claim as being supported by indirect evidence, we analyze it under the *McDonnell Douglas* burden-shifting framework.

Defendants assert that Lockhart has failed to establish a prima facie case on the sole basis that she cannot demonstrate that she had a qualifying disability at the time of her termination. Under the ADA, disability is defined as either "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or "being regarded as having such an impairment" "whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102 (1)-(3). Appellees argue that "Lockhart is not disabled because even if Lockhart suffers from a mental health condition, per her own testimony, her impairment

does not substantially limit any major life activities as she is still able to work and believes that she was and is mentally capable of holding gainful employment." Appellees Br. at 11.

The record clearly demonstrates that Lockhart was diagnosed with what can only be categorized as a severely limiting mental-health condition by two different mental-health professionals. And even if Lockhart somehow failed to establish that she has an impairment that substantially limits major life activities, there can be no doubt that the District regarded her as having such an impairment, given that one of the stated reasons Hampton gave for recommending Lockhart's termination was the psychologist's report finding Lockhart incapable of working as a teacher. Thus, there is no merit to Defendants' argument that Lockhart does not qualify as disabled under the ADA.

Having resolved Defendants' sole challenge to Lockhart's prima facie case, we must determine whether the District has put forward one or more legitimate, nondiscriminatory reasons for terminating Lockhart's employment. *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019). Defendants assert that there were several legitimate and nondiscriminatory reasons motivating Lockhart's termination, specifically her

> admitted use of illegal marijuana on various dates during January 2018, and earlier dates, her use of her position as a teacher for Marietta City Schools to discuss, share, and teach about her religion/religious beliefs/experience with students and others during the school instructional day even though she was instructed by her supervisor to refrain from engaging in such conversations, admitting that she no longer had control over what she says, and continuing to discuss her employment and related issues with students after she was instructed to refrain from such conduct . . . .

Appellees Br. at 16. Notably, in the record and in the district court, the District specifically listed Dr. Lee's assessment that Lockhart "was not capable of performing the essential functions of her [] position as a teacher within [] legal and ethical boundaries" as an additional reason for her termination. R. 34, PID 122. Because this given reason appears to encompass Lockhart's

16

admission that she no longer had control over what she says, we will consider this as one stated reason in our analysis below.

At this step of the analysis the employer's burden is merely one of "production, not of persuasion, and it does not involve a credibility assessment." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009). As to Lockhart's use of marijuana, this standard is clearly satisfied. Although Lockhart disputes the District's assertion that she used marijuana *recently*, she testified that she smoked marijuana on June 9, 2017, and "a couple times" after that. R. 48, PID 1019–20. Defendants explained below that recreational use of marijuana is illegal in Ohio and that Lockhart's role as a teacher requires her to serve as a role model to middle-school students. Defendants only burden at this stage of the analysis is to produce evidence supporting the proffered reason for termination; they need not persuade the court that Lockhart was actually terminated because of her marijuana use. *Tex. Dept. of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). Thus, the district court correctly found that Defendants met their burden of production by putting forth Lockhart's marijuana use as a legitimate justification for her termination.

The analysis applicable to the District's other proffered reasons for termination is a bit more involved because there is reason to believe Lockhart's discussion of her religion during school hours and her ongoing contact with students following her placement on administrative leave both qualify as disability-related conduct. An employer may not

> rightfully fire an employee for disability-related conduct that is not related to work performance and does not violate some work-place or societal rule. Rather, an employer should "tolerate eccentric or unusual conduct caused by the employee's mental disability, so long as the employee can satisfactorily perform the essential functions of his job.

*Chandler v. Specialty Tires of Am. (Tennessee), Inc.*, 134 F. App'x 921, 929 (6th Cir. 2005) (quoting *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1088 (10th Cir. 1997)). However, "an employer may legitimately fire an employee for conduct, even conduct that occurs as a result of a

disability, if that conduct disqualifies the employee from his or her job." *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 366 (6th Cir. 2007), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc).

Here, the District's policy forbidding teachers from sharing their religious beliefs with public-school students was job-related and consistent with the mission and obligations of public education. The District presented significant evidence that Lockhart violated this policy on numerous occasions, including after being admonished not to do so by school administrators. Thus, although this conduct was almost certainly related to Lockhart's disability, it still constitutes a legitimate non-discriminatory reason for terminating Lockhart.

The same goes for Lockhart's communication with students after being placed on administrative leave and specifically instructed not to discuss her employment or related matters with students. The record demonstrates that Lockhart reached out to students on multiple occasions after being placed on administrative leave and her communications with students were indisputably inappropriate. Lockhart at one point messaged a student indicating that her visions could help defend the student's uncle in a legal battle, and on numerous occasions she sent students messages disparaging the school administration and asking students not to reveal their conversations to the school. Plaintiff's continued inappropriate communication with students constitutes an additional legitimate reason for terminating Lockhart.

Having determined that three of the reasons for Lockhart's termination put forward by the District constitute legitimate, non-discriminatory justifications for Lockhart's termination, we now consider whether Lockhart has shown that the proffered reasons for termination were mere pretext. "A plaintiff may establish that an employer's stated reason for its employment action was pretextual by showing that the reason (1) had no basis in fact, (2) did not actually motivate the

challenged conduct, or (3) is insufficient to explain the challenged conduct." *Upshaw*, 576 F.3d at 586. "The plaintiff must produce 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against h[er].'" *Id.* (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)) (alteration in original).

Lockhart claims that she can demonstrate that her termination was pretextual under all three prongs. As to her alleged marijuana use, Lockhart asserts that this allegation has "no basis in fact," seemingly implying that because her marijuana was limited to a single, non-recent occurrence, it could not be a justification for her termination. Lockhart's argument on this point directly contradicts her deposition testimony admitting to the use of marijuana on multiple occasions. Lockhart also claims that the charge that she was inappropriately communicating with staff and students regarding her religious beliefs is false and "completely contradicted by evidence in the record."[4] Appellant Br. at 19. But Lockhart's inappropriate communication with students is well documented in the record, and based on the evidence presented by the District, as well as Lockhart's own testimony, there can be little doubt that her discussions with students violated school policy and legitimately concerned the District.

Lockhart has a somewhat stronger argument that the proffered reasons may not actually have motivated her termination. The District admitted that Dr. Lee's psychological assessment that Lockhart could not perform the essential functions of her position was one of the motivations for terminating her employment. Thus, Defendant's own litigating position suggests that Lockhart's termination was at least partially motivated by her disability diagnosis. But that does

---

[4] Lockhart's argument here is that sharing her religious experience was not teaching about religious doctrine and therefore was not problematic. But her emails and Facebook messages with students were both inappropriate and clearly violative of public school policy requiring teachers to refrain from endorsing or teaching about religion.

not end the inquiry. Unlike in Title VII cases, where the plaintiff is merely required to demonstrate that discrimination was a motivating factor for the challenged conduct, in ADA cases the plaintiff must demonstrate that discrimination was a "but-for cause" of the challenged conduct. *Lewis*, 681 F.3d at 321.

So, the question becomes whether Lockhart can demonstrate that her disability was a but-for cause of her termination. Here that means that Lockhart must show that a reasonable juror could find that she would not have been terminated if Dr. Lee had not diagnosed her with bipolar disorder or deemed her unfit to perform the essential functions of her position.

Given the nature of Lockhart's job as a middle-school teacher, the extent of her inappropriate communications with students, and the frequency of her misconduct, Lockhart faces an uphill battle on this front. But, an admission in the record makes Lockhart's position more tenable. During his deposition, Hampton was asked whether Lockhart would have been permitted to come back to work had she been deemed fit for duty by Dr. Lee, and responded "[o]f course," admitting that if Lockhart had been deemed able to perform the essential functions of her job she would have been "taken off paid administrative leave and put back in the classroom." R. 50, PID 1163. This undermines the District's position that Lockhart would have been terminated for her marijuana use and discussion of religion with students regardless of the results of the assessment by Dr. Lee. However, the District's proffered reasons for Lockhart's termination also included her continued refusal to abide by the District's directives that she cease communicating with students while on administrative leave, which occurred *after* Dr. Lee provided his report to Hampton. So even if Hampton ordered the psychiatric evaluation with the intention of keeping Lockhart employed if she was deemed fit-for-duty, that does not mean that Lockhart's continued misconduct following the evaluation would not have separately prompted her termination. Thus,

20

Hampton's admission is not definitive evidence that Lockhart's disability was a but-for cause of her termination.

Lockhart argues that the District cannot rely on her conduct occurring after Dr. Lee's assessment to support her termination because "an employer, who learns about an employee's disability, cannot stand by, allow the disability to further impede the employee's performance, and then use the disability as a means to terminate that employee." Appellant Br. at 42. It is true that "failure to consider the possibility of reasonable accommodation for known disabilities, if it leads to discharge for performance inadequacies resulting from the disabilit[y], amounts to a discharge solely because of the disabilit[y]." *Fisher*, 951 F.3d at 418. But this does not necessarily change the analysis. The District was not on notice of Lockhart's disability until after her misconduct began; in fact, it was Lockhart's inappropriate conversations with students regarding her "religious experience" that first raised concerns regarding Lockhart's psychological state and prompted the District to order her evaluation with Dr. Lee. But at least some of her continuing communications with students occurred after the District became aware of her disability. Putting aside the merits of Lockhart's separate failure-to-accommodate claim, we must assess whether a reasonable jury could find that the District's failure to consider reasonable accommodations led to Lockhart's misconduct, specifically her inappropriate communication with students while on administrative leave. It is not clear what interventions the District could have considered that would have prevented Lockhart from engaging in continued misconduct. The District had already placed Lockhart on paid administrative leave and explicitly instructed her to stay away from school grounds and otherwise refrain from contacting students. As part of her failure-to-accommodate claim, Lockhart suggests that the District should have considered placing her on extended leave to allow her time to seek treatment for her bipolar disorder, but Lockhart was on administrative leave

when this misconduct occurred, so that would not have addressed this particular misconduct. Moreover, the District had no ability to force Lockhart to seek psychiatric treatment, or otherwise control her off-site conduct to prevent her continued communication with students. Lockhart fails to identify what, if any, alternative options existed for the school to protect its students from Lockhart's inappropriate conduct, after administrators' admonishments and placement of Lockhart on leave failed to prevent Lockhart's continued communications with students. For that reason, it cannot be said that the District's failure to consider reasonable accommodations led to Lockhart's misconduct.

The above analysis leads us to conclude that Lockhart cannot demonstrate that her disability, rather than her misconduct, was a but-for cause of her termination. After the District placed Lockhart on leave, effectively removing her from the school and its students while it evaluated the appropriate next-steps, she continued to undermine the school's mission and interfered with its obligation to protect its students by ignoring the District's clear directives and maintaining persistent and inappropriate contact with the school's pupils. At that point the administration had no choice but to recommend the termination of Lockhart's contract. Thus, a reasonable jury could not conclude that Lockhart would not have been terminated for her misconduct, in particular her continued inappropriate communications with students while on administrative leave, but-for her disability.

**B.**

Nor can Lockhart succeed on her failure-to-accommodate claim. The relevant EEOC guidance explains that "[a]n employer must make reasonable accommodation to enable an otherwise qualified individual with a disability to meet . . . conduct standard[s] in the future," but "[b]ecause reasonable accommodation is always prospective . . . an employer is not required to

excuse past misconduct." EEOC-CVG-1997-2. Thus, once Lockhart engaged in misconduct warranting termination, the District was allowed to proceed with disciplinary hearings and take the steps necessary to finalize her termination. It was not required to excuse her misconduct, keep her on staff, and consider what reasonable accommodations would allow her to fulfill the requirements of her role as a teacher moving forward.

The District was not on notice, and therefore had no reason to consider reasonable accommodation for Lockhart until after she began discussing her religious experience with students in violation of school policy, at which point she was nearly immediately placed on administrative leave. And Lockhart had no communication with the District that could possibly be considered a request for accommodation until the April 5, 2018 board meeting when she raised the issue of extended administrative leave. But at that point Lockhart had already repeatedly violated the terms of the administrative leave the District had imposed. Accordingly, Defendants were entitled to summary judgment on Plaintiff's failure-to-accommodate claim.

## III.

For the foregoing reasons, we AFFIRM the district court's grant of Defendants' motion for summary judgment.